UNITED STATES of America, Appellee,

v.

**Morris J. EISEN, Joseph P. Napoli, Harold M. Fishman, Dennis Rella, Marty Gabe, Geraldine G. Morganti, and Alan Weinstein, Defendants–Appellants,**

**Leonard Kagel, Defendant.**

**Nos. 1311 through 1313, 1315, 1324, 1325, 1327 and 1491, Dockets 91–1549(L), 91–1551 through 91–1555, 91–1633 and 92–1032.**

United States Court of Appeals, Second Circuit.

Argued April 29, 1992.

Decided Aug. 17, 1992.

---

247

250

Alan M. Dershowitz, New York City (Nathan Z. Dershowitz, Dershowitz & Eiger), for defendant-appellant Eisen.

Joseph P. Napoli, pro se.

Steven R. Kartagener, New York City (Roger L. Stavis, Kartagener & Stavis, on the brief), for defendant-appellant Fishman.

Richard Mischel, New York City, for defendants-appellants Rella and Morganti.

Martin J. Siegel, New York City, for defendant-appellant Gabe.

Ronald E. DePetris, New York City (Seth F. Kaufman, Carro, Spanbock, Kaster & Cuiffo, on the brief), for defendant-appellant Weinstein.

Faith E. Gay, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., Susan Corkery, David C. James, Peter A. Norling, Asst. U.S. Attys., on the brief), for appellee.

Before: MESKILL, Chief Judge, TIMBERS and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This is an appeal of RICO convictions arising from a law firm's fraudulent con-

duct of civil litigation as plaintiff's counsel in personal injury cases. The appeal is brought by Morris J. Eisen, Joseph P. Napoli, Harold M. Fishman, Dennis Rella, Marty Gabe, Geraldine G. Morganti, and Alan Weinstein from judgments of the United States District Court for the Eastern District of New York (Charles P. Sifton, Judge), following a four-month jury trial. We affirm.

### Background

Morris J. Eisen, P.C. ("the Eisen firm") was a large Manhattan law firm that specialized in bringing personal injury suits on behalf of plaintiffs. The defendants, seven of the Eisen firm's attorneys, investigators, and office personnel, were tried jointly on two counts of conducting and conspiring to conduct the affairs of the Eisen firm through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c), (d) (1988). The indictment alleged, as the underlying acts of racketeering, that each of the defendants committed, among other crimes, numerous acts of mail fraud, in violation of 18 U.S.C. § 1341 (1988); and bribery of witnesses, in violation of New York Penal Law § 215.00 (McKinney 1988).

Eisen was the founder, sole shareholder, and principal attorney of the Eisen firm. Napoli was associated with the Eisen firm in an "of counsel" capacity, and he was the main trial attorney for the firm. Fishman, a trial attorney, was also "of counsel" to the firm. The Eisen firm regularly used investigators to assist attorneys in the trial preparation of personal injury cases, and defendants Weinstein, Gabe, and Rella were private investigators affiliated with the firm. Morganti was the office administrator of the Eisen firm with responsibility for managing the daily affairs of the firm, including assigning attorneys and investigators to particular cases, monitoring the firm's daily calendar, and managing the financial and personnel operations of the firm.

The evidence at trial established that the defendants conducted the affairs of the

Eisen law firm through a pattern of mail fraud and witness bribery by pursuing counterfeit claims and using false witnesses in personal injury trials, and that the Eisen firm earned millions in contingency fees from personal injury suits involving fraud or bribery. The methods by which the frauds were accomplished included pressuring accident witnesses to testify falsely, paying individuals to testify falsely that they had witnessed accidents, paying unfavorable witnesses not to testify, and creating false photographs, documents, and physical evidence of accidents for use before and during trial. The Government's proof included the testimony of numerous Eisen firm attorneys and employees as well as Eisen firm clients, defense attorneys, and witnesses involved in the fraudulent personal injury suits. Transcripts, correspondence, and trial exhibits from the fraudulent personal injury suits were also introduced.

The racketeering acts considered by the jury related to the defendants' conduct with regard to 18 fraudulent personal injury lawsuits in which the plaintiff was represented by the Eisen firm. The defendants were found guilty of racketeering acts involving the following personal injury cases:

Eisen: *Mulnick, Schwartz, Stanton;*
Napoli: *Ferri, Mulnick, Robbins, Rehberger;*
Fishman: *Aboud, Schwartz, Tuning, Nieves;*
Rella: *Miceli, Rehberger, Schwartz;*
Gabe: *Robbins, Stanton, Nieves;*
Morganti: *Miceli, Schwartz, Stanton, Pietrafesa;*
Weinstein: *Aboud, Schwartz, Tuning, Nieves, Metrano.*

The jury convicted all seven defendants of RICO substantive and conspiracy offenses after three weeks of deliberations.[1]

### Discussion

#### I. Legal Sufficiency of Charges

##### A. Mail Fraud

■ Weinstein argues that a scheme to deprive an adversary of money by means

---

1. Rella's RICO conviction was vacated because the racketeering acts underlying that conviction were not committed within the limitations period.

of a civil lawsuit conducted fraudulently does not constitute mail fraud because there is no deprivation of property as defined by the Supreme Court in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In that case, the Supreme Court held that the mail fraud statute does not reach schemes to defraud citizens of their right to honest and impartial government but is instead "limited in scope to the protection of property rights." *Id.* at 360, 107 S.Ct. at 2882. Looking to the legislative history of the statute, which "indicates that the original impetus ... was to protect the people from schemes to deprive them of their money or property," the Court concluded that

the words "to defraud" commonly refer to "wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching."

*Id.* at 356, 358, 107 S.Ct. at 2880, 2881 (footnote and citation omitted). In reversing the convictions of defendants charged with scheming to deprive the state of its right to honest government by having a state agency share proceeds with business entities in which the defendants held interests, the Supreme Court emphasized that there was no allegation that the state or its citizens had been deprived of any money or property. *Id.* at 360–61, 107 S.Ct. at 2881–82.

Weinstein contends that the right of the civil defendants and their liability insurers to have a judgment in a civil proceeding obtained free of fraud and perjury is an intangible right not cognizable under the mail fraud statute. The Government responds that the mail fraud predicates at issue here allege a scheme to defraud that comports squarely with the *McNally* definition of mail fraud because the Eisen indictment explicitly alleges a scheme to deprive the victims of money.

Weinstein relies on *United States v. Eckhardt*, 843 F.2d 989 (7th Cir.), *cert. denied*, 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988). In *Eckhardt*, the defendant had operated a phony tax shelter scheme and

had committed perjury and submitted false documents in a civil proceeding brought by his investors against the IRS to challenge disallowance of their deductions. The indictment charged him with a scheme

To defraud the United States by impeding and impairing, obstructing and defeating the lawful functions of the Internal Revenue Service in the ascertainment computations, assessment and collection of the revenue, to wit, income taxes, of taxpayer-investors....

843 F.2d at 996. The Seventh Circuit concluded that this allegation failed to allege mail fraud in light of *McNally*. It found that the indictment charged the defendant with

interfering with the IRS's proper ascertainment and collection of income taxes. It does not specifically allege that he deprived the government of revenue.... [I]t is not sufficient to allege conduct which could have resulted in the government's failure to collect revenue owed to it.... The connection between the charged conduct and the loss of revenue here is too tenuous and speculative to constitute an actual deprivation of money or property.

*Id.* at 996–97.

Weinstein's reliance on *Eckhardt* is unavailing. The *Eisen* indictment contained precisely what was found to be lacking in the *Eckhardt* indictment: the allegation of a scheme to defraud the litigant of money or property. We have upheld charges similar to those made in *Eckhardt* where an indictment has alleged a scheme to defraud the Government of money. *See United States v. Porcelli*, 865 F.2d 1352 (2d Cir.), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) (upholding conviction for mail fraud against *McNally* challenge where defendant was charged with defrauding state government of its right to sue for sales tax he failed to collect); *United States v. Rubin*, 844 F.2d 979, 985–86 (2d Cir.1988) (upholding conviction for mail fraud where defendant defrauded New York State of public revenues).

Weinstein next contends that even if the civil defendants were deprived of property,

the only party "deceived" by the alleged fraud were civil juries that awarded the money judgment. Because the juries were not claimed to have been injured, Weinstein argues that the "convergence theory" of mail fraud, which, he contends, requires that the party defrauded and the party injured be identical, *see United States v. Evans*, 844 F.2d 36, 39 (2d Cir.1988), is not satisfied. Even if the "convergence theory" is applicable, which we do not decide,[2] its requirements are met here. Weinstein's argument that "the civil defendant is contesting, not relying on, the truth of the allegedly false testimony," Brief for Appellant Weinstein at 36, and is therefore not deceived by a corrupt adversary takes an unrealistically narrow view of the charges in this case and ignores settled authority that perjury and fake evidence defraud the adverse party.

First, a number of the mail fraud predicates in the indictment alleged fraud that was perpetrated directly on the civil defendants and their liability insurers before the lawsuit reached trial. In several cases, misrepresentations in pleadings and pretrial submissions were made in the hope of fraudulently inducing a settlement before trial. And in cases that went to trial, fraudulent representations concerning the claims were directed at the civil defendants and their insurers in an effort to induce settlement before verdict. In fact, several of the lawsuits listed in the indictment were settled. Even in cases decided by a jury, defendants' misconduct was intended to defraud their adversaries. Litigants depend on the integrity of the conduct of participants in civil proceedings though disputing the validity of their opponents' claims to impose or resist civil liability. It is one thing to challenge the perception, memory, or bias of an opponent's witnesses; it is quite another for a party's lawyer and a witness to concoct testimony that they know has been wholly fabricated.

Moreover, Weinstein's claim that perjured testimony suborned by the defendants was directed at the civil juries rather than at the other litigants ignores relevant case law. In *United States v. Rodolitz*, 786 F.2d 77 (2d Cir.), *cert. denied*, 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986), the defendant had brought a fraudulent civil action against his insurance company and recovered a money judgment from the company at trial. In affirming the defendant's conviction for mail fraud, this Court explicitly recognized that false evidence at a civil trial works a fraud not only on the jury but on the opposing party as well. *Id.* at 80–81. *See also Averbach v. Rival Manufacturing Co.*, 809 F.2d 1016 (3d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987).

■ Weinstein also argues that the causation between the fraud and the resulting deprivation of property is too "attenuated." However, the Government need establish only an intent to harm; it is not required to prove that the victim was actually injured as a result of the scheme, *see United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987), much less that any injury that did occur resulted solely from the fraud, *see Rodolitz, supra.* In *Rodolitz*, we found a sufficient causal link between the defendant's failure to disclose evidence in his trial to recover losses from his insurance company and the resulting judgment against the company, regardless of what the trial jury may actually have relied upon in reaching its verdict.

■ Finally, Weinstein contends that permitting the mail fraud offenses charged in the *Eisen* indictment to serve as RICO predicate acts conflicts with the deliberate decision made by Congress in omitting perjury as one of the enumerated RICO predicate offenses within the definition of "racketeering activity." *See* 18 U.S.C. § 1961(1).

---

2. Some District Courts in this Circuit have concluded that this Court's dicta in *Evans* stands only for the proposition that a civil RICO plaintiff must have been injured to have standing under section 1964. *See, e.g., Shaw v. Rolex Watch U.S.A.*, 726 F.Supp. 969, 972–73 (S.D.N.Y. 1989); *Galerie Furstenberg v. Coffaro*, 697 F.Supp. 1282, 1288 (S.D.N.Y.1988). Other district courts outside this Circuit have rejected the convergence theory altogether. *See Texas Air Corp. v. Air Line Pilots Ass'n Int.*, No. Civ. 88–0804, 1989 WL 146414, 1989 U.S. Dist. LEXIS 11149 (S.D.Fla. July 14, 1989); *Lewis v. Lhu*, 696 F.Supp. 723, 727 (D.D.C.1988).

Contrary to the Government's abrupt dismissal of this argument as "baseless," Brief for Appellee at 36, we recognize that there is some tension between the congressional decision to include federal mail fraud as a predicate offense and to exclude perjury, whether in violation of federal or state law. That tension is illustrated by this prosecution in which the fraudulent scheme consists primarily of arranging for state court witnesses to commit perjury.

Though the tension exists, we do not believe it places the indictment in this case beyond the purview of RICO. Congress did not wish to permit instances of federal or state court perjury as such to constitute a pattern of RICO racketeering acts. Apparently, there was an understandable reluctance to use federal criminal law as a back-stop for all state court litigation. Nevertheless, where, as here, a fraudulent scheme falls within the scope of the federal mail fraud statute and the other elements of RICO are established, use of the mail fraud offense as a RICO predicate act cannot be suspended simply because perjury is part of the means for perpetrating the fraud. We do not doubt that where a series of related state court perjuries occurs, it will often be possible to allege and prove both a scheme to defraud within the meaning of the mail fraud statute as well as the elements of a RICO violation. But in such cases, it will not be the fact of the perjuries alone that suffices to bring the matter within the scope of RICO. In any event, we cannot carve out from the coverage of RICO an exception for mail fraud offenses that involve state court perjuries.

### B. State Law Bribery

■ 1. *"Witness" as required by § 215.00 of New York Penal Law.* Weinstein, Rella, Morganti, and Fishman all attack various witness bribery racketeering acts by arguing that the individual allegedly bribed was not a "witness or a person about to be called as a witness" within the meaning of Section 215.00 of the New York Penal Law. The statute provides in pertinent part:

A person is guilty of bribing a witness when he confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that (a) the testimony of such witness will thereby be influenced, or (b) such witness will absent himself from, or otherwise avoid or seek to avoid appearing or testifying at, such action or proceeding.

N.Y.Penal Law § 215.00 (McKinney 1988)

The New York Court of Appeals has held that a person's status as a witness under section 215.00 "depends upon the evidence he can supply the court, not the immediacy of the need for the evidence," nor whether a subpoena has been issued in order to secure it. *People v. Bell,* 73 N.Y.2d 153, 164, 538 N.Y.S.2d 754, 760, 535 N.E.2d 1294, 1300 (1989). The Court stated that if "the evidence is sufficient to support a finding that defendant reasonably should have believed that the person would be a witness and that he intentionally attempted to influence the witness's testimony ... the crime is complete." *Id.*

Weinstein challenges the witness bribery racketeering act in one of the fraudulent tort cases, *Metrano,* on the ground that there was insufficient evidence that Alberto Troche was a "witness or a person about to be called as a witness" within the meaning of section 215.00. The *Metrano* case arose from injuries sustained by Metrano when he was shot in the leg by a Manhattan parking lot attendant, Alberto Troche, during a row over a parking lot fee. Metrano subsequently retained the Eisen firm, which brought a civil suit against Troche and Troche's employer, Simone Grossman. The action against Grossman was based on allegations that Grossman should have known that Troche was dangerous and carried a gun. The Eisen firm retained Weinstein as the investigator on the case, which settled on the eve of trial for $300,000.

At the *Eisen* trial, Troche testified that Weinstein had come to his home and offered him $5,000 to testify that his employer was aware that he had dangerous propensities and that he carried a gun. Troche had secretly taped this meeting, and

the tape was introduced into evidence at the *Eisen* trial.

Troche, having inflicted the injury that formed the basis of the tort action, was clearly someone Weinstein reasonably should have believed would be a witness in the case. On the tape, Weinstein made repeated references to what Troche must do "when he comes to court" or when he "takes the stand," showing that he clearly anticipated that Troche would be a key witness in the case.

■ In an effort to avoid Troche's obvious status as a witness, Weinstein argues that he did not commit bribery against Troche, but that Troche committed extortion against him. The extortionate conduct, he contends, defeats a section 215.00 violation because it negates the essential element of *mens rea* in the crime of bribery. Although the tape recording provides some support for Weinstein's contention that Troche might have offered his testimony to the highest bidder, other aspects of the tape recording and Troche's testimony at the *Eisen* trial provide sufficient evidence that Weinstein had the requisite intent to bribe Troche and that Weinstein's conduct fits easily within the proscription of section 215.00. Both the tape recording and the trial testimony reveal that Weinstein initiated the contact with Troche, that Weinstein was the first to broach the subject of money during their taped meeting, and that Weinstein described the testimony he sought to buy from Troche. Clearly a reasonable jury could find that Troche was a "person about to be called as a witness" in the *Metrano* trial and that Weinstein had the requisite intent to bribe Troche.

■ Rella argues that Eddie Goldstein, who testified in the *Rehberger* case was not a "witness" within the meaning of section 215.00, and Morganti makes the same claim with respect to Arnold Lustig, who testified in the *Schwartz* and *Aboud* cases, because neither Goldstein nor Lustig had observed the accidents about which they testified but were paid to offer completely fraudulent testimony. The claim that Goldstein and Lustig do not meet the statutory definition of "witness" because their testimony was entirely fraudulent and thus they had no "evidence" to supply the court is frivolous. In the dictionary sense, a witness is "one who, being present, personally sees or perceives a thing," or one "whose declaration under oath (or affirmation) is received as evidence for any purpose." *See Black's Law Dictionary* 1438 (5th ed. 1979). Section 215.00 contains no indication that it is limited to this core definition of this term to the exclusion of a more functional definition. The section, which explicitly reaches attempts to influence the testimony of a "witness" as well as those "about to be called as a witness," applies to benefits conferred in order to induce someone to hold himself out *as* a witness and offer wholly fraudulent testimony to the court. The statute is not limited to payments for testimony that is false only in part. Both Goldstein and Lustig were paid money to give false testimony, both were prepared to testify falsely, and both were called to testify falsely at personal injury trials. It is of no consequence that the "evidence" offered and the status of the men as "witnesses" was entirely an outgrowth of the defendants' criminal designs.

2. *Falsity of influenced testimony.* Section 215.00 provides in pertinent part that a person is guilty of bribing a witness "when he confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness ... upon an agreement or understanding that (a) the testimony of such witness will thereby be influenced,...." On its face, the statute requires just two elements of proof: the offer of a benefit to a witness and the agreement or understanding that the witness's testimony will be influenced by such benefit. *See People v. Shaffer*, 130 A.D.2d 431, 432, 515 N.Y.S.2d 470, 471 (1st Dep't 1987) ("All that is required for a bribery to be complete is the offer or agreement to confer a benefit upon the defendant's agreement or understanding that the witness' testimony will thereby be influenced."). "Understanding," as used in the statute, has long been construed as tantamount to the *defendant's* intent, *see People*

*v. Kathan,* 136 A.D. 303, 120 N.Y.S. 1096 (1910), and it is not necessary for conviction that the jury find that the bribe's intended recipient shared that intent. *See People v. Kramer,* 132 Misc.2d 753, 505 N.Y.S.2d 769 (Sup.Ct.), *modified on other grounds,* 132 A.D.2d 708, 518 N.Y.S.2d 189 (2d Dep't 1986). The statute contains no requirement that the benefit actually be conferred or that the testimony actually be influenced. *See Shaffer,* 130 A.D.2d at 432, 515 N.Y.S.2d at 471.

■ Weinstein argued in the District Court that section 215.00 requires two additional elements of proof: (a) that the defendant subjectively believe that testimony, "influenced" as he desires, would be untruthful and (b) that testimony so "influenced" would in fact be untruthful. Although the District Judge originally incorporated both requirements in the proposed charge, he reconsidered his view following the Government's timely objection. Weinstein now complains about the substance and the timing of that ruling.

The charge that Judge Sifton ultimately gave incorporated one of the elements proposed by Weinstein. He instructed the jurors that with respect to the intent element on the charge of witness bribery, they must find that the defendant paid money to a witness in order to get the witness to modify the substance of his testimony in a way that the defendant believed would be false. He did not instruct the jury that it would be a defense to the crime if by sheer happenstance the testimony so influenced turned out to be true.

The essence of bribery is the intent to influence improperly the conduct of another by bestowing a benefit, *see* 39 N.Y.Penal Law § 215.00, at 553 (Practice Commentaries) (McKinney 1988); as there is no requirement that the intended result be accomplished, *see Shaffer,* 130 A.D.2d at 432, 515 N.Y.S.2d at 471, the District Judge properly refused to charge the jury that the fortuity that the testimony, as "influenced," turned out to be truthful would be a defense to the charge.[3]

■ Weinstein also complains that the District Court's charge on the elements of bribery violated Rule 30 of the Federal Rules of Criminal Procedure, requiring a trial court to issue rulings on requests to charge prior to summations in order to afford the parties an opportunity to frame their closing remarks in light of the court's subsequent legal instructions. *See United States v. Lyles,* 593 F.2d 182, 186 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Tourine,* 428 F.2d 865, 868–69 (2d Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971). If the Rule is violated, reversal is required where the defendant can show that he was "substantially misled in formulating his arguments" or otherwise prejudiced. *United States v. Smith,* 629 F.2d 650, 653 (10th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980). *See Lyles,* 593 F.2d at 186; *United States v. Conlin,* 551 F.2d 534, 539 (2d Cir.), *cert. denied,* 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977).

Weinstein was not prejudiced by Judge Sifton's decision, made after the charging conference, to revise the proposed charge as to the elements of witness bribery. When the issue was raised in the charging conference, the Government objected to the proposed charge. Following an exchange between the Court and the Government on the question of whether the Government had to prove the actual falsity of the testimony sought by the defendant, Judge Sifton said, "All right. I'll consider that exception." Weinstein was on notice that his requested charge was the subject of further consideration and could not have been "substantially misled" by the Court in formulating his summation argument, which contended that the Government had to prove the actual falsity of the testimony sought. *Cf. Wright v. United States,* 339

---

**3.** The Government argues that the bribery statute properly applies whenever money is paid to influence testimony, even if money is paid to secure what the defendant believes is truthful testimony. Because the Judge's charge required the jury to find that the defendant believed that he was seeking to influence testimony in a false direction, we need not decide if section 215.00 extends to payments to influence a witness to testify truthfully.

F.2d 578, 579–80 (9th Cir.1964) (reversal required where court did not respond to defense request for pre-summation rulings on requests to charge, advised counsel to "go ahead and argue the case any way you want to argue it," and in its charge rejected the theory of defense offered in summation). Moreover, following the summation, the court advised Weinstein's counsel that the charge was not in accord with his argument and offered counsel an opportunity to address the jury again. Having ignored this offer, counsel has no valid claim of prejudice.

## II. Sufficiency of Evidence

### A. The *Mulnick* Case—Racketeering Act Three

■ The jury found Eisen guilty of witness bribery and found Eisen and Napoli guilty of mail fraud in connection with the *Mulnick* case. Both Eisen and Napoli contend that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that they committed mail fraud in connection with the *Mulnick* case. Both defendants also contend that invalidation of the *Mulnick* predicate would undermine their RICO substantive and conspiracy convictions. Relying on the standard recently employed by this Court in *United States v. Paccione*, 949 F.2d 1183, 1198 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992), defendants argue that in a RICO case, where one or more predicates is held invalid on appeal, the RICO conviction cannot stand unless the error in submitting the invalid predicate to the jury is demonstrated to be harmless beyond a reasonable doubt.[4] Upon careful review of the record, we conclude that the defendants' sufficiency arguments are unavailing.

The *Mulnick* case arose out of injuries suffered by Beth Mulnick in 1979 when she was struck by a car as she was crossing a Manhattan street with her friend Patti Ki-

bel. The Eisen firm sued the car's driver on Mulnick's behalf. Napoli was the attorney assigned to the case, which settled for $1 million after the trial testimony of Patti Kibel. At the *Mulnick* trial, Kibel had testified that Mulnick was crossing the street with the light and within the crosswalk, dropped her glove, and returned several paces to retrieve it, and that the car then ran into her while she was in the crosswalk with the light still in her favor.

At the *Eisen* trial, Kibel testified that her testimony at the *Mulnick* trial had been false and that various Eisen firm lawyers, including Eisen and Napoli, caused, or acquiesced in, her false testimony that Mulnick had been crossing with the light. Eisen and Napoli contend that Kibel's testimony at the *Eisen* trial was too equivocal to support a jury finding that Eisen or Napoli either prepared or caused Kibel to testify falsely at the *Mulnick* trial.

With respect to Napoli, Kibel testified at the *Eisen* trial that, prior to her testimony at the *Mulnick* trial, she told the man who "prepared" her that her anticipated testimony about the accident was false. Although Kibel could not recall the identity or appearance of the lawyer who conducted this trial, it was established through the testimony of other witnesses and documentary evidence that Napoli was the Eisen firm trial attorney who questioned witnesses at the *Mulnick* trial. Contrary to Napoli's suggestion, the Government was not required to prove that he specifically formulated the lie to which Kibel was to testify. Instead, as the indictment charged, the Government needed to establish that Napoli had either prepared or caused Kibel to testify falsely. To prove this, it was plainly sufficient to establish that Kibel told Napoli the truth about the Mulnick accident but that Napoli did nothing to dissuade her from testifying to the false version conjured by the Eisen firm and that he caused her to testify falsely by putting her on the

---

4. In *Paccione,* the Court found that there was no doubt that the jury would have convicted defendant Paccione of a RICO violation even in the absence of the invalid predicate because eight valid predicates remained and because the pattern of verdicts returned against co-defendants on the RICO count demonstrated that the invalid predicate was not an ingredient in the jury's RICO verdicts.

stand and eliciting the perjurious testimony from her.

With respect to Eisen, Kibel's testimony is even more indefinite. Eisen claims that Kibel's wavering testimony at the *Eisen* trial is insufficient proof that he was the person who instructed Kibel to provide false testimony in connection with the *Mulnick* case. Kibel's recollection was vague as to the details of her conversations with Eisen, but on direct examination she stated that she told Eisen the truth about Beth Mulnick's accident and that he instructed her to give a false account of how the accident occurred. However, when questioned on cross-examination as to any particular element of the fabricated story offered by her at the *Mulnick* trial, Kibel could not recall whether Eisen or someone else in the Eisen firm had suggested the alteration. The Government argues that Kibel's assertion on direct that Eisen instructed her how to testify is not invalidated by her inability to remember on cross-examination what Eisen had said to her on specific topics and who precisely had caused her to testify as she did to particular aspects of her testimony. The Government argues that the weakness of Kibel's testimony was a matter for cross-examination, and that any apparent tension in her testimony was a matter of credibility to be resolved by the jury.

We need not decide whether Kibel's equivocal testimony constituted sufficient evidence to support the jury's finding with respect to the mail fraud allegation against Eisen specified in the *Mulnick* predicate act, racketeering act 3. That act (one of three charged against Eisen) alleged that Eisen engaged in criminal activity in connection with the *Mulnick* case in two distinct ways: (1) that he committed mail fraud for the purpose of executing a scheme to prepare and cause Patti Kibel to testify falsely at trial, and (2) that he caused another person to bribe a New York City Police Officer who was about to be called as a witness in connection with the case. The jury indicated on the verdict form that it found Eisen had committed racketeering act 3 both by committing witness bribery and mail fraud. Eisen does not allege any infirmity with the jury's finding on the witness bribery aspect of the *Mulnick* predicate.[5]

A finding either of mail fraud or of witness bribery would have been sufficient to support the *Mulnick* racketeering act. Thus the invalidation of one of two sufficient bases *specifically* found by the jury to support this predicate would not undermine the jury's finding that Eisen committed a racketeering act with respect to the *Mulnick* case. *Cf. Griffin v. United States,* —— U.S. ——, —— – ——, 112 S.Ct. 466, 469–74, 116 L.Ed.2d 371 (1991) (even a *general* verdict in a criminal case is to be upheld on appeal against a claim of insufficient evidence to support one of alternative bases for conviction whenever the evidence suffices for at least one basis). In light of the fact that Eisen's challenge does not compromise the validity of the *Mulnick* predicate, and the ample evidence that the *Mulnick* case was fraudulent and that Eisen participated in the fraud, we have no doubt that the jury would have convicted Eisen on the RICO substantive and conspiracy charges even if it had found that the *Mulnick* racketeering act rested only on bribery. *Cf. Paccione,* 949 F.2d at 1198 (jury would have convicted defendant of a RICO violation even in the absence of an *invalid* predicate).

### B. The *Pietrafesa* Case—Racketeering Act Twenty–Six

 Morganti claims that there was insufficient evidence that she committed mail fraud in connection with the *Pietrafesa* case. That case arose from injuries sus-

5. Officer William Mulligan testified at the *Eisen* trial that he wrote the original police report of the Mulnick accident, which indicated that Kibel had stated at the time of the accident that Mulnick was crossing the street against the light. He further testified that he had been offered a bribe several days before the *Mulnick* trial by Eisen firm investigator Frank Laine to testify that he could not recall Kibel's statement. Laine, who testified under a grant of immunity at the *Eisen* trial, admitted that he had indeed attempted to bribe the officer and had done so at Eisen's request.

tained by Carmella Pietrafesa when she slipped on a sidewalk outside a supermarket in Greenwich Village. The Eisen firm sued the supermarket on behalf of Pietrafesa. The Eisen firm relied on the testimony of Morganti's 70–year–old mother, Helen Gaimari, who lived four blocks from the supermarket, to establish that the supermarket had prior notice of the sidewalk defect. At trial, Gaimari testified that she gave Pietrafesa her name at the time of the accident, had fallen because of the same defect months before, and had previously complained to the supermarket about the defect. It was not disclosed to defense counsel in the *Pietrafesa* case that Gaimari was the mother of Morganti, the Eisen firm's office manager. The jury returned a verdict for Pietrafesa of approximately $35,000.

■ Morganti argues that the Government adduced no affirmative evidence that Morganti caused her mother to testify, or that her mother, Helen Gaimari, testified falsely. In evaluating this claim we must credit every inference that can be drawn in the Government's favor, whether from direct or circumstantial evidence. *See, e.g., United States v. Parker,* 903 F.2d 91, 96–97 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990). Moreover, the jury is free to draw negative inferences from an untruthful witness's testimony as long as there is affirmative testimony to supplement or corroborate those negative inferences. *See United States v. Marchand,* 564 F.2d 983, 985–86, 1000–01 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978).

The Government points to the testimony of five witnesses to support the inference that Morganti caused her mother to testify and that the testimony was false. The plaintiff, Carmella Pietrafesa, testified in a deposition preceding her personal injury trial that she had not gotten the names of the people who helped her up at the time of her accident. In contrast, she testified at her own trial and at the *Eisen* trial that an elderly woman who turned out to be Gaimari picked her up and gave her a piece of paper containing Gaimari's name and number. Pietrafesa also testified at the *Eisen* trial that during the course of trial preparation she had had a few discussions with Morganti concerning her case.

Frank DeSalvo, an Eisen firm attorney, testified about his handling of the *Pietrafesa* case. He stated that he sent out a letter to defense counsel on November 11, 1982, stating that there were no witnesses to Pietrafesa's accident. DeSalvo testified that he represented Pietrafesa at the December 20, 1982, deposition in which she stated that she did not get the name of the person who helped her up. He further testified that he sent a second letter to defense counsel in the *Pietrafesa* case three days after the deposition that listed Helen Gaimari, Morganti's mother, as a notice witness to Pietrafesa's accident. However, even though DeSalvo had dated Morganti's daughter and had met Gaimari, he claimed to know the older woman only as "Grandma Helen."

Evan Torgan, another attorney formerly associated with the Eisen firm, testified that Morganti and Eisen assigned him the cases that he tried at the Eisen office, that he had tried the *Pietrafesa* case in November 1984, and that it was his practice to report trial verdicts to Morganti. He further testified that he was dating Morganti's daughter around the end of 1984 or the beginning of 1985 but also claimed that he did not learn that Gaimari was Morganti's mother until after the *Pietrafesa* trial ended.

Gaimari testified at the *Eisen* trial that sometime after the accident, she was called by a lawyer who asked her to testify at the *Pietrafesa* trial; the lawyer indicated that he knew Gaimari was Morganti's mother.

Robert Steindorf, a defense attorney at the *Pietrafesa* trial, testified that Gaimari was a crucial witness against his client because she was the only notice witness at that trial who was not related to Pietrafesa.

Giving credence to every inference that could be drawn in the Government's favor from the direct and circumstantial evidence elicited from these witnesses, we find that

a reasonable juror could find that Gaimari gave false testimony concerning her presence at the Pietrafesa accident. We are, however, unable to conclude that a reasonable juror could find, beyond a reasonable doubt, that Morganti caused Gaimari to give false testimony in the *Pietrafesa* case. The Government invites us to rely on Morganti's familial relation to Gaimari as well as Morganti's role in the Eisen firm. While these factors may indicate that Morganti had abundant opportunity to cause Gaimari to give false testimony, they provide an insufficient basis for a reasonable juror to conclude beyond a reasonable doubt that Morganti played a role in having her mother testify falsely at the *Pietrafesa* trial. Although, having persuaded the jury that Gaimari was untruthful, the prosecutor might have invited the jury to disbelieve Gaimari's denials of her daughter's involvement, without affirmative evidence in corroboration, such a negative inference is, by itself, insufficient to support the conviction. *Marchand,* 564 F.2d at 986. "A jury's verdict will be sustained if there is *substantial evidence,* taking the view most favorable to the government, to support it." *United States v. Mulheren,* 938 F.2d 364, 368 (2d Cir.1991) (citations omitted) (emphasis in original). In this case Morganti has met the very heavy burden of demonstrating that the evidence at trial was insufficient to prove her guilt beyond a reasonable doubt.

█ We must now determine whether the invalidation of this racketeering act undermines Morganti's substantive and conspiracy RICO convictions. We conclude that the error in submitting the invalid predicate to the jury was harmless beyond a reasonable doubt. *See Paccione,* 949 F.2d at 1198. Three valid racketeering acts remain, those relating to the *Miceli, Schwartz,* and *Stanton* cases. In each of these cases there was direct and unequivocal testimony that Morganti was an active participant in the cabal to falsify testimony. Furthermore, the pattern of verdicts returned against co-defendants confirms our conclusion that the jury would have returned the RICO convictions in the absence of the invalid predicate. Eisen,

Gabe, and Rella were convicted of the RICO counts on the basis of a jury finding that they had each committed three racketeering acts. Morganti shares a pair of valid predicates in common with those of Eisen and Rella: Morganti and Eisen were both found guilty of the *Schwartz* and *Stanton* predicates; Morganti and Rella were both found guilty of the *Miceli* and *Schwartz* predicates. The acts alleged against Morganti in the *Miceli, Schwartz,* and *Stanton* predicates occurred, respectively, in 1983, in 1984, and between 1984 and 1988, and thus the substantive RICO conviction remains timely. Because the jury has already found that these predicates relate to each other as well as to the enterprise, and because we have no hesitancy in finding that, even without the *Pietrafesa* predicate, these three racketeering predicates posed a threat of continuity, we affirm Morganti's substantive and conspiracy RICO convictions. *See United States v. Minicone,* 960 F.2d 1099, 1106 (2d Cir.) (to establish pattern of racketeering, prosecution must show racketeering predicates are horizontally and vertically related, and that they amount to or pose threat of continued criminal activity), *cert. denied,* — U.S. —, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992).

## III. Leak of Grand Jury Testimony

█ Eisen argues, on behalf of all defendants, that he is entitled to a hearing on his claim that he was prejudiced by a leak of grand jury testimony. Shortly before the trial began, *The Village Voice* published an article about the case. The author of the article purported to summarize the contents of the testimony of four grand jury witnesses and indicated that the source of the information was not the witnesses themselves. In fact, the story indicated that one of the witnesses whose testimony was outlined had refused to speak to the *Voice* about his grand jury appearance. After the publication of the article, Eisen moved for a hearing to determine whether grand jury secrecy had been violated. Eisen claimed that a leak could prejudice his trial because trial witnesses exposed to the

article could tailor their testimony to dovetail with the sworn testimony of others. The District Court denied the request for a hearing but referred the case to the Department of Justice ("DOJ"), requesting an expedited investigation.

After trial, almost seven months since the matter was referred to DOJ and in spite of some prodding by Judge Sifton, little if any progress had been made on the investigation, and Eisen renewed his request for a court hearing. The Government was quick to ascertain the status of the DOJ investigation and informed the Court that DOJ investigators had formed a preliminary plan for investigation and. would soon begin to conduct interviews concerning the matter. The District Court again rejected Eisen's request, stating that it had no obligation to supervise or instigate an investigation in the absence of a *prima facie* showing of prejudice to the defendant as a consequence of the alleged leak. The Judge noted that Eisen had had opportunity and incentive to develop evidence of "cross-pollination" among witnesses due to the alleged leak but had failed to do so. The Court also noted its reluctance to hold a hearing while there was an ongoing federal investigation.

At oral argument of this appeal, the Government maintained that the DOJ investigation had concluded, that the investigation had shed no light on whether or how the integrity and secrecy of the grand jury proceeding had been compromised, and that the results of the investigation had been forwarded to Eisen's counsel. The Government also represented to this Court that the results would be forwarded to the District Court.

A breach of grand jury secrecy can jeopardize the defendant's right to a fair trial before a petit jury. *See United States v. Friedman*, 854 F.2d 535, 583 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). However, a defendant seeking reversal or a hearing regarding alleged grand jury abuse must show prejudice or bias. *See id.* at 583–84 (in the absence of showing of prejudice, district court's refusal, without

holding a hearing, to grant post-trial relief for alleged grand jury leaks not error); *see also United States v. Helmsley*, 866 F.2d 19, 22 (2d Cir.1988) (noting approval of district court procedure of referring to Department of Justice charges of prosecutorial misconduct in leak of grand jury testimony), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989).

Eisen contends that he has made a *prima facie* showing of prejudice. He asserts that the trial record indicated that cross-pollination as a result of the grand jury leaks seemingly had occurred in at least one instance: one witness's testimony in the grand jury about backdating a report, disclosed in the *Voice* article, was echoed in another witness's trial testimony about the report; although that witness had never mentioned any backdating at his grand jury appearances. While this confluence of testimony may be suspect, we agree with the District Court that the defendants had the opportunity and incentive to develop such possibilities of prejudice into evidence of prejudice during the cross-examination of witnesses.

Eisen argues that it would have been "foolhardy" to seek to establish evidence of cross-pollination during cross-examination, that a defendant should not be required to pursue an agenda distinct from his trial agenda, and that he should not be faulted for forgoing the opportunity when he was led to believe that the DOJ was making prompt inquiries. We disagree. If, on cross-examination a defendant had been able to expose that prosecution witnesses had changed their testimony in response to the testimony of other witnesses, that fact would have been devastating to the Government and entirely consistent with the defendant's "trial agenda." Moreover, a defendant's interest in showing that the Government's case has profited from a breach of grand jury secrecy is distinct from the DOJ's inquiry into whether a leak has occurred and who was responsible. Referring the matter to the DOJ did not absolve Eisen of the obligation to discover and come forward with some evidence of prejudice, if any existed, in order to obtain

a hearing or further relief on the ground that grand jury secrecy had been violated. The District Court did not err in denying a hearing.

## IV. Testimony from Hostile Government Witnesses

■■■ Eisen argues that he was deprived of a fair trial because the Government was permitted to call numerous witnesses associated with the defendants and to elicit from them trial testimony that the Government anticipated would be perjurious and argued to the jury was in fact perjurious. In its opening, the prosecution told the jury that it would call some witnesses "who have refused to give up the lie or the fraud of the particular case that they were involved in." The Government made this argument with regard to a portion of the testimony of 11 of its 75 witnesses. The District Judge allowed the practice, reasoning that it was not unduly prejudicial because the witnesses' testimony, in fact, tended to exculpate the defendants, and because the prosecutor confined himself to arguing that each witness persisted in his lie from personal motives rather than at the behest of the defendants. Eisen argues that this evidence should have been excluded because it was irrelevant, and even if it was relevant, Eisen argues, it should have been excluded because the danger of unfair prejudice substantially outweighed its probative value.

Eisen contends that the testimony from these witnesses exculpating the defendants was not probative of the Government's theory of the case and therefore should not have been presented to the jury. The Government notes, however, that impeachment of hostile Government witnesses is admissible as negative inference evidence, *see Marchand*, 564 F.2d at 985–86, and that the testimony of these hostile witnesses provided other affirmative proof that was important to the Government's case.

In arguing that this practice should not have been permitted, Eisen relies on two sets of cases that are clearly distinguishable. First, Eisen points to a series of cases that hold that while a jury may be permitted to draw negative inferences from disbelieved testimony, a case cannot go to a jury solely on that basis.[6] Second, Eisen relies on a series of cases that hold that a party may not call a witness whose testimony it knows to be adverse for the sole purpose of impeaching him and thereby presenting evidence to the jury that would not otherwise be admissible.[7] The first line of cases is inapposite because in this case there was independent evidence to support the Government's case. The second line of cases is inapplicable because the Government did not call these witnesses as a mere subterfuge to get before the jury evidence not otherwise admissible.

■■■ Federal Rule of Evidence 607 provides: "The credibility of a witness may be attacked by any party, including the party calling the witness." Rule 607, having no special restrictions, allows the Government to impeach its own witnesses. *United States v. DeLillo*, 620 F.2d 939, 946–47 (2d Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 107, 108, 66 L.Ed.2d 41 (1980). Where the Government has called a witness whose corroborating testimony is instrumental to constructing the Government's case, the Government has the right to question the witness, and to attempt to impeach him,

---

**6.** *See Martin v. Citibank N.A.*, 762 F.2d 212, 217–18 (2d Cir.1985); *United States v. Jenkins*, 510 F.2d 495, 499 (2d Cir.1975); *Davis v. National Mortgagee Corp.*, 349 F.2d 175, 178 (2d Cir. 1965); *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir.1952); *Pariso v. Towse*, 45 F.2d 962, 964 (2d Cir.1930).

In *Dyer v. MacDougall*, Judge Learned Hand observed that "the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the

truth of what he denies." 201 F.2d at 269. However, the Court went on to hold that "although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him." *Id.*

**7.** *See United States v. Morlang*, 531 F.2d 183, 189–90 (4th Cir.1975); *United States v. Johnson*, 802 F.2d 1459, 1466 (D.C.Cir.1986).

about those aspects of his testimony that conflict with the Government's account of the same events. *Id.* Here, the testimony of the hostile witnesses provided affirmative proof that was necessary to construct the Government's case, and thus the Government was entitled to question these witnesses and to invite the jury to disbelieve that portion of their accounts that contradicted the prosecution's theory of the case.

 Eisen claims that, if the Government is allowed to proceed in this fashion, it could "routinely pre-empt the defendant, offer his 'defense,' and effectively preclude him from presenting his case as he and his lawyers determined to be in his best interests." Brief for Appellant Eisen at 31 n. 34. Eisen complains that in eliciting testimony exculpatory of the defendants, the Government, in essence, foisted witnesses and testimony onto the defendants' case thereby curtailing their ability to shape their own defense. Certainly, a defendant should be allowed to present his best defense consistent with the bounds of the law and the limits of the practicable. But the defendants cannot blame the Government's actions in this case for frustrating their ability to put on such a defense. The Government called as witnesses those who had participated in various ways in the personal injury suits underlying the allegations in the indictment and who clearly had relevant evidence to offer the Court. The Government need not confine itself to fragments of their testimony just because the witnesses persist in repeating untruthful portions.

 A finding that the evidence was relevant and that the practice at issue is not proscribed does not, however, end the inquiry. Under Federal Rule of Evidence 403, the trial judge must determine if relevant evidence should be excluded because its "probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Robinson,* 560 F.2d 507, 513–14 (2d Cir.1977) (in banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). We give the trial judge wide discretion in assessing the balance,

and his ruling will not be overturned unless he acted "arbitrarily or irrationally." *Id.* at 515. Eisen does not argue that the Government introduced highly prejudicial or inflammatory evidence in order to impeach these witnesses; instead he argues that, in the context of a case revolving around the subornation of perjury, the very argument that the witnesses were lying was highly prejudicial. Eisen contends that because the defendants are accused of suborning these witnesses' perjury (or conspiring with them to suborn perjurious testimony) in the underlying personal injury trials, the jury will naturally assume that the Government accuses the defendants of complicity in these criminal trial lies as well. The Court, however, had foreclosed this line of argument and the prosecutor was careful to attribute the alleged lies to the personal motivations of these witnesses. The District Court acted reasonably in concluding that the negative inference evidence need not be excluded as unfairly prejudicial simply because of the risk that the jury might, nonetheless, embrace a theory of causation eschewed by the prosecution.

## V. Statute of Limitations

 Gabe and Rella both contend that their convictions are barred by the five-year statute of limitations period of 18 U.S.C. § 3282 (1988). Gabe argues that all of the racketeering acts with which he is charged fall outside the five-year limitations period. In making this argument, Gabe incorrectly assumes that the mail fraud claims date from the time the fraud was conceived or from the time of the underlying civil trial. However, the statute of limitations in a mail fraud case runs from the date of the charged mailing, notwithstanding that the defendant's actions concerning the scheme to defraud occurred before the statutory period. *See United States v. Read,* 658 F.2d 1225, 1240 (7th Cir.1981); *United States v. Ashdown,* 509 F.2d 793, 797–98 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). *See also United States v. Weinberg,* 656 F.Supp. 1020, 1026 (E.D.N.Y. 1987). Because at least one of the proven

mailings in the racketeering acts of which Gabe was found guilty occurred within five years of the filing of the original indictment, Gabe's timeliness claim fails.

■ Rella argues that because the substantive RICO count against him was dismissed as untimely, the RICO conspiracy count must fail as well. All three of the racketeering acts that the jury found Rella to have committed fall outside of the five-year limitations period, and thus the substantive RICO count was properly dismissed. However, the statute of limitations for a RICO conspiracy does not begin to run until the objectives of the conspiracy have been either achieved or abandoned. *United States v. Persico*, 832 F.2d 705, 713 (2d Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 1996, 100 L.Ed.2d 227 (1988). The jury found that the RICO conspiracy comprehended conduct that occurred as late as 1988, and because there was no evidence that the criminal objectives of the conspiracy were abandoned, this count against Rella was not time-barred.

## VI. Ineffective Representation

■ Napoli appeals from Judge Sifton's denial of his section 2255 petition for a new trial. In that petition, Napoli claimed that his Sixth Amendment right to effective assistance of counsel had been violated as a result of an alleged conflict of interest of his trial counsel, Gerald L. Shargel. The alleged conflict of interest was said to arise from Shargel's disqualification in an unrelated case, *see United States v. Gotti*, 771 F.Supp. 552 (E.D.N.Y.1991), which occurred during the trial of this case. We affirm the District Court's denial of the petition.

■ Napoli argues that Shargel's disqualification in the *Gotti* case resulted in both a *per se* and an actual deprivation of Napoli's Sixth Amendment right to effective assistance of counsel in this case. In order to sustain a claim that a *per se* violation occurred, a defendant must establish that his lawyer suffered from an actual conflict of interest with regard to presenting a vigorous defense of the defendant.

*See United States v. Aiello*, 900 F.2d 528, 530–31 (2d Cir.1990). Upon a showing of such a conflict, a defendant need not demonstrate prejudice because a conflict inhibiting a lawyer's performance is such an affront to the right to effective assistance of counsel that we have found that such a circumstance demonstrates a denial of that right. *Id.* We have found a *per se* Sixth Amendment violation where trial counsel was implicated in the very crime for which his client was on trial. *See United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984). We also applied a *per se* rule where a defendant was represented by a person not authorized to practice law. *See Solina v. United States*, 709 F.2d 160 (2d Cir.1983). In both cases, we found that counsel had reason to fear that vigorous advocacy on behalf of his client might provoke inquiries on the part of the court or prosecutor that might expose the lawyer to criminal liability or other sanction. *See Cancilla*, 725 F.2d at 870; *Solina*, 709 F.2d at 164. However, this Court's decision in *Aiello*, makes clear that Napoli's allegations fail to support a *per se* claim. In *Aiello*, we rejected the argument that an attorney under investigation for obstruction of justice and tax evasion at the time of the defendant's trial on narcotics charges had suffered from an actual conflict of interest constituting a *per se* violation of the defendant's Sixth Amendment right. The four factors on which this Court relied in rejecting Aiello's conflict of interest claim are also present here. First, unlike the facts in *Cancilla*, the attorney's purported activity (*i.e.*, his alleged involvement with the Gotti organization) was totally unrelated to the mail fraud and witness bribery crimes for which Napoli was being tried. *See Aiello*, 900 F.2d at 531. Second, there is no allegation that Shargel's representation of Napoli in the *Eisen* case was the "impetus" for the investigation into Shargel's involvement with the *Gotti* defendants. *See Aiello*, 900 F.2d at 531–32. Third, Napoli has offered no basis upon which to believe that Shargel's defense of Napoli was intended to please or impress the *Gotti* prosecutors, who did not participate in the *Eisen* case. *See Aiello*, 900 F.2d at 532. Finally, unlike

the attorney in *Solina,* there is no question that Shargel was authorized to practice law at all times during this case. *See Aiello,* 900 F.2d at 532.

There is no suggestion that Shargel's vigorous representation of Napoli would have subjected him to sanction or risked exposure of any wrongdoing on his part. And any claim that Shargel's attention may have been "diverted" by the disqualification proceeding in the *Gotti* case is insufficient to establish an actual conflict of interest. A theoretical or merely speculative conflict of interest will not invoke the *per se* rule. *See Aiello,* 900 F.2d at 532.

Because Napoli has failed to show an actual conflict of interest, he must overcome the presumption that his counsel's conduct was reasonable by satisfying the two-pronged standard of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See United States v. Cruz,* 785 F.2d 399, 405 (2d Cir.1986). Napoli must show that (1) "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms" and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. at 2065, 2068.

Out of a trial record of almost 10,000 pages, Napoli culls five instances of alleged deficiencies in Shargel's performance. On review of the record, we are convinced that Shargel's overall performance was vigorous, sustained, and effective. Furthermore, we find that none of the five instances complained of falls "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066.

Napoli first points to Shargel's stipulation that a disputed mailing in the *Robbins* case had been mailed. Shargel decided to stipulate to the fact of mailing once informed that James LaRossa, co-defendant Eisen's attorney, had entered into a stipulation with the Government to that effect. Napoli now claims that the author of the letter would have testified that the letter had been hand-delivered and that it

was incompetent for Shargel to stipulate to the contrary. Napoli ignores evidence that the relevant document had in fact been mailed—a subsequent letter written by its author so stating. Moreover, even if Shargel did not personally verify this fact, it was reasonable for him to rely on the representation of co-defendant's counsel that the author admitted the mailing. Furthermore, had the author been called to take the stand to testify to hand delivery, his testimony would have been impeached by his previous letter maintaining that it had been mailed. *See Aiello,* 900 F.2d at 532–33 (failure to call exculpatory witness not ineffective representation because testimony could have been impeached).

The next four instances of claimed ineffective assistance relate to decisions that "fall squarely within the ambit of trial strategy, and, if reasonably made," cannot support an ineffective assistance claim. *See United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). As his second example, Napoli claims that Shargel should have advised him to testify on his own behalf, and that Shargel should have done a more thorough job of impeaching two prosecution witnesses. "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *Id.* It was a reasonable tactical decision to rely exclusively on attacking the Government's witnesses and presenting independent testimony rather than to subject Napoli to all of the risk attendant on cross-examination. "Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature." *Id.* Shargel had subjected both of these witnesses to vigorous cross-examination. As Judge Sifton found, Shargel could have reasonably concluded that further cross-examination on relatively unimportant matters would have confused or fatigued the jury.

■ As the third instance, Napoli points to Shargel's decision not to lay blame for the charged crimes on the other defendants. Clearly this was a reasonable strategic decision. An effort to blame the other defendants might have provoked retaliation in the same vein, and the Government would have been the sole beneficiary of such a development.

■ Fourth, Napoli claims that, in support of Napoli's motion for sequestration of the jury, Shargel should have introduced newspaper clippings referring to the Government's accusations against Shargel in the *Gotti* case. While this might have been the preferable course, we cannot say that Shargel's omission was below an objective level of competence since none of the other defense attorneys included such clippings in their similar motions but instead relied on paraphrasing. Furthermore, Shargel did submit a number of the press accounts in support of Napoli's claim of error in failure to sequester made in his motion for a new trial. The issue, including the nature and content of the articles, was thus properly preserved for appeal, and no prejudice occurred from the initial failure to include the materials.

. Finally, Napoli claims that Shargel's failure to attack the Government in his summation is evidence of a change in his attitude toward the Government following the disqualification motion. Shargel's summation lasted an entire day and occupies almost two hundred pages of transcript. Shargel assailed the Government's evidence in each of the racketeering acts charged against Napoli and reviewed the exculpatory testimony. Furthermore, he clearly was not seeking to curry favor with the prosecution when he claimed that the Government "paid their witnesses with a price that we could never afford," had intentionally overlooked its own witnesses' inconsistent statements, and had been overly "righteous and sanctimonious" in discrediting exculpatory testimony. The comprehensive and vehement nature of Shargel's summation refutes Napoli's claim. *See Nersesian*, 824 F.2d at 1321.

In none of the five instances complained of did Shargel's performance fall below an objective standard of reasonableness, and Napoli does not even attempt to demonstrate a reasonable probability that the result of the proceeding would have been different absent the allegedly unprofessional conduct.

## VII. Prosecutorial Misconduct and Prejudicial Publicity Regarding the *Gotti* Case

■ On Friday, February 22, 1991, after the jury in the *Eisen* trial had begun deliberations, argument was heard on an application by the prosecution in the *Gotti* case to disqualify several of the defense lawyers in that case including Shargel, who was then representing Napoli in the *Eisen* trial. Napoli contends that the prosecutors in the *Gotti* case acted improperly by repeating in open court allegations made against Shargel in the Government's sealed papers, and that these allegations improperly affected the jury's deliberations in the *Eisen* case. Napoli also argues that the Court improperly denied his motion to sequester the jury.

"If a prosecutor abuses her discretion by intentionally attempting to distort the fact-finding process, then a due process violation exists." *United States v. Angiulo*, 897 F.2d 1169, 1191 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). But Napoli does not claim that the Government prosecutors in the *Gotti* case intentionally provoked press coverage with the aim of prejudicing the jury in the *Eisen* case, nor does he offer any evidence that the *Gotti* prosecutors even anticipated such a result. Moreover, the District Court took suitable precautions to ensure that the jury was not exposed to the press accounts of the allegations.

When the problem was brought to Judge Sifton's attention on the Friday of the hearing in the *Gotti* case, the Judge determined that he would speak with each juror individually in chambers about avoiding all news media over the weekend. Defense counsel objected to individual interviews, arguing that it would magnify the problem,

and instead requested sequestration. The Judge denied sequestration, but conducted a general inquiry of the jury, asking the jury to avoid all news media over the weekend and providing a means by which concerned jurors could call the Court to ascertain the progress of then pending events in the Persian Gulf without resort to the media. The jurors gave their general agreement that they would comply.

The steps taken to protect the integrity of the jury deliberations were adequate under the circumstances. In *United States v. Casamento*, 887 F.2d 1141, 1154–55 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), this Court found that the "great deal" of media attention surrounding an organized crime trial did not render it unfair in light of Judge Leval's instruction to the jury to avoid press accounts about the case. We held that "[i]n the absence of evidence to the contrary, we will presume the jury followed these admonitions and avoided exposure to news reports about the trial." *Id.* Although Judge Leval conducted an individual interview with the jurors, the defendants here specifically requested that no such individual *voir dire* be conducted for fear of magnifying the problem. *See also United States v. Gaggi*, 811 F.2d 47, 53 (2d Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).

Moreover, as in *Gaggi*, we may find confirmation of the jury's ability to render an impartial verdict in "the care which it took in its deliberations." 811 F.2d at 53. As the District Court noted in rejecting these claims post-trial, jury deliberations lasted from February 14 through March 4, 1991, with several notes sent out each day requesting to review exhibits or to have extensive testimony read back. And in its determination, the jury carefully distinguished among defendants and among predicate acts, finding 16 of 22 racketeering acts proven.

In the absence of any suggestion that the prosecutors in the *Gotti* case were acting in bad faith, in light of the fact that the allegations did not concern the trial in this case, the defendants on trial, or any of the

events at issue in the case, and giving due weight to the District Court's cautionary measures, we find no due process violation and reject Napoli's request for a new trial.

Furthermore, Napoli's claim that the District Court erred in denying his motion to sequester the jury in response to the *Gotti* proceedings is without merit. "The decision to sequester the jury to avoid exposure to publicity is committed to the discretion of the court, and failure to sequester the jury can rarely be grounds for reversal." *United States v. Salerno*, 868 F.2d 524, 540 (2d Cir.), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989). Judge Sifton did not abuse his discretion and his precautions seem entirely adequate to the remote threat of prejudice from the expected publicity concerning Napoli's attorney and his representation of another client in a completely unrelated matter.

## VIII. Sentencing

Fishman, Napoli, Gabe, and Rella contend that the District Court erred in applying the Sentencing Guidelines in sentencing them on the RICO conspiracy count. Each of these defendants asserts that, for various reasons, his liability for participation in the conspiracy cannot extend past November 1, 1987, the effective date of the Guidelines. We conclude that the District Court correctly applied the Sentencing Guidelines to each of these defendants.

This Court has determined that persons convicted of offenses that began before and continued after November 1, 1987, (so called "straddle crimes") would, upon sentencing, be subject to the Sentencing Guidelines. *See United States v. Story*, 891 F.2d 988, 994 (2d Cir.1989). The RICO conspiracy charged in this case ran from January 1981 to June 1990, and thus straddled the effective date of the Guidelines. Moreover, the jury found three defendants—Eisen, Gabe, and Morganti—guilty of a predicate act of mail fraud in connection with the *Stanton* case, which included a mailing on March 29, 1988. Thus, the conspiracy of which the defendants were

convicted continued after the effective date of the guidelines.

▉▉▉▉▉ Gabe complains that the jury was not asked to determine whether the conspiracy straddled the effective date of the Guidelines. However, for purposes of applying the Guidelines, "the period during which an offense occurs is considered a 'sentencing factor' to be determined by a judge—instead of an element of the offense to be determined by a jury." *United States v. Bloom*, 945 F.2d 14, 17 (2d Cir. 1991). The District Court did not err in finding by a preponderance of the evidence that the conspiracy extended beyond November 1, 1987. Gabe also argues that he should not have been sentenced under the Guidelines because he played a "minimal role" in the conspiracy. The extent of Gabe's role, while relevant in determining the appropriate length of his sentence within the Guidelines, *see* U.S.S.G. § 3B1.2 (Guideline adjustments for mitigating role in the offense), has no bearing on the threshold question of whether the Guidelines should apply to his conspiracy conviction.

▉▉▉▉▉ Napoli argues that application of the Guidelines to his conviction violates *ex post facto* principles because he "did nothing after November 1, 1987 and did not plan anything which ultimately transpired after that date." Brief for Appellant Napoli at 140. The Court may find a continuation of conspiratorial liability even though the particular defendant has ceased to engage in overt conduct relating to the conspiracy prior to November 1, 1987, if it was foreseeable that the conspiracy would continue past that date. *See, e.g., United States v. Devine*, 934 F.2d 1325, 1332 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 349, 116 L.Ed.2d 288 (1991). This holding derives from the basic principle that conspirators are generally held liable for the known or reasonably foreseeable acts of all other co-conspirators committed in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). Contrary to Napoli's contention, the acts of co-conspirators occurring after November 1, 1987, may be attributable to a defendant for purposes of the application of the Sentencing Guidelines in the absence of evidence that the defendant somehow "caused" those acts. *See United States v. Rosa*, 891 F.2d 1063, 1068–69 (3d Cir.1989) (applying Guidelines to co-conspirator who did nothing to further the conspiracy after 1986 in the absence of any proof that he affirmatively renounced the conspiracy prior to November 1, 1987). Defendants committing no acts in furtherance of a conspiracy after the effective date of the Guidelines are not subject to *ex post facto* punishment because they could have "taken steps to prevent the final element of the crime from occurring," *United States v. Alkins*, 925 F.2d 541, 549 (2d Cir.1991), before the statute became effective; they could have withdrawn from the conspiracy. *See Rosa*, 891 F.2d at 1069. Napoli does not claim that he ever withdrew from the conspiracy.

▉▉▉▉ Rella and Fishman contend that they affirmatively withdrew from the conspiracy before the effective date of the Guidelines. In order to demonstrate withdrawal from a conspiracy, the defendant has the burden of proving "some act that affirmatively established that he disavowed his criminal association with the conspiracy ... and that he communicated his withdrawal to the co-conspirators." *United States v. Minicone*, 960 F.2d at 1108 (citations omitted). "[M]ere cessation of conspiratorial activity is not enough" to satisfy this standard. *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir.1988).

Rella contends that he withdrew from the conspiracy when he left the firm as its "in-house" investigator in 1984. However, Rella continued to work for the firm on an *ad hoc* basis thereafter. The parties' stipulation that there was no showing that any of the work performed by Rella after 1984 was tainted by illegality does not alter the significance of Rella's continued associa-

tion with the Eisen firm. The District Court correctly found that the stipulation established, at most, Rella's "mere cessation" of illegal conduct, which was insufficient to prove his withdrawal from the conspiracy. *See id.*

■ Fishman contends that he affirmatively withdrew from the conspiracy before the effective date of the Guidelines by resigning his position at the Eisen firm in order to practice with another, independent law firm. Fishman relies on this Court's decision in *Nerlinger,* in which the defendant participated in a conspiracy to defraud the customers of a brokerage firm. The defendant's role in the conspiracy was to open and maintain a bogus account with the firm for the purpose of diverting profits fraudulently obtained by his co-conspirators. *Id.* We ruled that the defendant had withdrawn from the conspiracy before the conspiracy's termination by resigning from the brokerage firm and closing the account, reasoning that by doing so the defendant had foreclosed the possibility of further participation in the conspiracy and relinquished any claim to subsequent profits. *Id.* at 974–75. However, in this case the District Court found that there was evidence that, after leaving the law firm, Fishman "continued to be entitled to a percentage of the recovery on all cases he tried including those giving rise to his pre–1985 racketeering acts."

■ Fishman argues that he received an annualized salary from the Eisen firm and was not entitled to a percentage of the recovery of the cases he tried. Stephen DiJoseph, a cooperating co-defendant, testified that Fishman had told him that he was getting "a piece of the action on the cases he tried." Fishman faults the District Court for denying his request for a hearing on this disputed sentencing factor. However, the District Court has broad discretion to determine the procedure by which it will resolve disputed issues at sentencing, so long as it affords the defendant some opportunity to rebut the Government's allegations. *See United States v. Prescott,* 920 F.2d 139, 143–44 (2d Cir. 1990). The District Court did not abuse its discretion in denying the hearing and was not clearly erroneous in concluding that Fishman failed to satisfy his burden of proving withdrawal from the conspiracy.[8]

## Conclusion

We have considered appellants' other arguments and find them to be without merit. The judgments of conviction appealed from are all affirmed.

---

**8.** The District Court also relied on another episode in determining that Fishman had not withdrawn from the conspiracy. The District Court found that in February 1988, Fishman, together with defendant Weinstein, sought to convince DiJoseph to lie to investigators in order to conceal his role in the *Schwartz* fraud. Fishman argues that such an effort constituted a later agreement between himself and Weinstein to conceal an earlier conspiracy and not a continuation in, or rejoining of, the original conspiracy. Post-conspiracy acts of concealment do not, without more, extend the life of the conspiracy after its main objective has been attained. *See Grunewald v. United States,* 353 U.S. 391, 399–402, 77 S.Ct. 963, 971–73, 1 L.Ed.2d 931 (1957); *Krulewitch v. United States,* 336 U.S. 440, 442–44, 69 S.Ct. 716, 717–19, 93 L.Ed. 790 (1949). Fishman, however, does not dispute that the original conspiracy was ongoing in February 1988, when he made the statements in question. Because the District Court found that Fishman did not effectively withdraw from the conspiracy when he resigned from the Eisen firm, Fishman was still a member of the conspiracy at the time of these efforts, and, clearly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy. *See United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1199 (2d Cir.), *cert. denied,* 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989).