27 F.3d 773
 UNITED STATES of America, Appellee-Cross-Appellant,
v.
Jose VEGAS, also known as Jose Rojas, also known as Chieto,
Defendant-Appellant,
Michael Virella and William Guzman,
Defendants-Appellants-Cross-Appellees.
 Nos. 777, 778, 779, 1413 and 1414, Dockets 93-1375, 93-1443,
93-1462, 93-1525 and 93-1526.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1994.
Decided June 13, 1994.
 
 Maria A. Barton, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., S.D.N.Y., Kenneth M. Karas, Cathy Seibel, David Raymond Lewis, Asst. U.S. Attys., of counsel, on the brief), for appellee-cross-appellant U.S.
 Mark L. Amsterdam, New York City (Amsterdam & Lewinter), for defendant-appellant Jose Rojas Vegas.
 Valerie S. Amsterdam, New York City, for defendant-appellant-cross-appellee Michael Virella.
 Roger L. Stavis, New York City (Steven R. Kartagener, Kartagener & Stavis, on the brief), for defendant-appellant-cross-appellee William Guzman.
 Before: KEARSE and LEVAL, Circuit Judges and POLLACK, Senior District Judge.*
 LEVAL, Circuit Judge:
 
 
 1
 Defendants Jose Vegas, Michael Virella and William Guzman appeal judgments of conviction entered in the Southern District of New York on both counts of a two-count indictment charging them with possession of heroin with intent to distribute and conspiracy to distribute heroin, in violation of 21 U.S.C. Secs. 812, 841(a)(1), 841(b)(1)(A), 841(b)(1)(B) & 846. Following pretrial proceedings before Judge Shirley Wohl Kram (S.D.N.Y.), the action against Vegas was severed and tried before Judge Robert L. Carter and a jury. On May 13, 1993, a judgment of conviction was entered. Virella and Guzman were tried before Judge Robert P. Patterson and a jury, which found them guilty; they were sentenced on June 7, 1993.
 
 
 2
 Vegas challenges his conviction on grounds of ineffective assistance of counsel; illegal search and seizure; improper admission of evidence and an improper jury charge. Guzman contends that evidence of a prior conviction was improperly admitted against him. Virella's claims include insufficiency of evidence and improper admission of evidence. We reject all claims of the three defendants, and affirm the convictions.
 
 
 3
 The Government appeals the sentence imposed by the trial court on William Guzman, contending that because Guzman testified that he was not involved in the drug transactions, yet was found guilty by the jury, the court was obligated to determine whether Guzman committed perjury and if so, to enhance his sentence for obstruction of justice, under United States Sentencing Guideline Sec. 3C1.1. We find that because the trial court did not make an affirmative finding that perjury was committed, the decision not to enhance Guzman's sentence was appropriate.
 
 Background
 The Government's case
 
 4
 The Government's evidence--substantially the same in both trials--was as follows.
 
 
 5
 In late January 1992, defendant Jose Vegas was introduced by John Carrero, an informant working for the Drug Enforcement Administration (DEA) to Nelson Almonte, another DEA informant. Vegas, in a tape-recorded conversation, offered to sell Almonte a kilogram of heroin, which Vegas said would be supplied by "Pakistanis" who were then in France and would soon be coming to New York. On February 3rd and 4th, Vegas contacted Almonte, told him the Pakistanis had arrived, gave him a sample of the heroin, and told him that the price would be $160,000. Vegas designated his apartment building as the location for the transaction, and told Almonte that when the deal took place, the Pakistani suppliers would be in another room in the building, because they did not want to be seen. On February 5th, at a pre-arranged time, Almonte met Vegas near Vegas's apartment. Vegas was accompanied by defendant William Guzman. Vegas, Guzman and Almonte went to Vegas's apartment where Vegas showed Almonte a one-ounce bag of heroin and all three men discussed the deal. When Vegas told Almonte that he wanted to do the deal in four transactions of one-fourth kilogram each--an arrangement that Guzman urged as a "safer" course--Almonte left the apartment to talk with his supposed confederate, DEA agent Luis Pizarro, who was waiting in a nearby car. Before Almonte left, Vegas said he would call his suppliers and tell them to bring the heroin.
 
 
 6
 Soon after Almonte left the Vegas apartment, Vegas paged Almonte; by telephone Almonte told Vegas that his partner wanted to buy the whole kilogram at once. Vegas then came out to the car to meet the partner (Agent Pizarro). Vegas showed Pizarro the one-ounce bag of heroin, and Pizarro showed Vegas $165,000 in cash. Vegas then returned to his building, telling Almonte and Pizarro that he would call them on Pizarro's car phone when the Pakistanis arrived with the heroin. Defendant Michael Virella was later observed entering a car parked in front of Vegas's building, where his brother, Frank Virella, was sitting, and then entering the building. Vegas then telephoned Almonte and said the suppliers had arrived; Almonte then went up to Vegas's apartment.
 
 
 7
 In the apartment, Vegas told Almonte that the heroin was "next door"; that one of the "Pakistanis" was "next door" with Guzman and the other was in a car out on the street. Vegas left the apartment, returning shortly thereafter with heroin, which he showed to Almonte. Vegas hid the heroin in the apartment, and then went outside with Almonte to get the payment from Almonte's partner, Agent Pizarro. Almonte suggested that Guzman leave with them, but Vegas replied that Guzman was protecting the Pakistani in the room next door.
 
 
 8
 As Almonte and Vegas left the building, Almonte signalled waiting DEA agents, who arrested Vegas and, using his keys, entered the building. The agents searched Vegas's apartment after getting his wife's permission. They recovered a quarter kilogram of heroin, lactose, a scale, several bullets, and some papers. They arrested Virella and Guzman in a room down the hall from the apartment, and recovered various papers and $1,640 cash from Virella.
 
 
 9
 In addition to evidence of the above events, the Government introduced evidence intended to prove that Virella was one of the "Pakistanis" referred to by Vegas as the heroin supplier. This included evidence that Virella roomed with one Kamal Khan, a native of Bangladesh (formerly East Pakistan); that he lived on a street heavily populated by Bangladeshis; that Virella, using the name Mr. Angelo, had flown with Khan on February 3, 1992, from London to Newark, on a flight that connected with a flight from Bangladesh; that Virella had numerous connections with Bangladesh and was carrying Bangladeshi currency and business cards when arrested; and that Virella had contacts with people in France (where Vegas said his heroin suppliers were).
 
 The defendants' cases
 Jose Vegas's trial
 
 10
 Jose Vegas testified at his trial, presenting an entrapment defense. Vegas asserted that John Carrero (the Government informant), whom he characterized as his "best friend," several times asked him to pose as a drug dealer. After twice refusing his friend's request because he feared getting into trouble with drugs, Vegas agreed to assist him. Carrero told Vegas that he would be introduced to some people as Carrero's drug connection; Vegas was to promise to supply drugs to them. Vegas testified that Carrero introduced him to the person he later learned was Almonte, that he arranged a drug deal with Almonte, that Carrero supplied him with the heroin sample he provided to Almonte, and that on February 5, the day of the drug deal, Carrero brought heroin to Vegas's home, weighed out an ounce and gave it to Vegas, and left a scale and other paraphernalia at Vegas's home. Later that day, Vegas testified, Almonte came to his home for the drug transaction.
 
 
 11
 Vegas further testified that Carrero directed him as to what to say in his meetings with Almonte, and that Carrero was the source of the heroin that Vegas planned to sell to Almonte. He also testified that defendant Guzman is his second cousin; that Guzman was in Vegas's apartment, but not in the same room, when Vegas and Almonte discussed the deal on February 5th; and that Michael Virella came by that day to borrow $1,500. Vegas acknowledged that many years earlier, he had been familiar with the illegal drug trade, and that he had been convicted in 1980 on a cocaine charge.
 
 
 12
 Vegas's counsel argued in his summation that Vegas had been entrapped into participating in the drug deal by John Carrero, who, unbeknownst to Vegas, was a government informer seeking to make deals in order to lighten his own sentence for drug charges.
 
 The Guzman/Virella trial
 
 13
 William Guzman took the stand in his trial. His defense was that his presence in Vegas's home during the drug deal was entirely innocent. Guzman testified that on February 5th, he visited the home of his cousin, Jose Vegas, and had dinner with Vegas in a nearby restaurant. When leaving the restaurant, a man he later learned was Nelson Almonte called out to his cousin, who introduced them. The three returned to the Vegas apartment. Guzman went into the living room where he talked with Vegas's 21-year-old nephew, Michael, and watched television, while Almonte and Vegas held a conversation in the dining room which Guzman could not hear. Almonte later left the apartment, and then Vegas's six-year-old son Nelson came into the living room and he and Guzman played with a video game. Some time later, Guzman, at Vegas's request, went to a room down the hall from Vegas's apartment to keep Michael Virella company. At one point, Vegas came to the room and spoke to Virella.
 
 
 14
 Guzman also testified that he was aware that Vegas was on probation, but did not know why; nor did he know that Vegas had served a prison term.
 
 
 15
 Michael Virella's defense was insufficiency of evidence. To support an argument that notations about chemistry found in his address book represented legitimate studies, he called an academic advisor from New York University, who testified that Virella, who he knew as Peter Francesco, had been accepted to NYU and was interested in majoring in chemistry. He also argued that the low purity of the heroin seized was inconsistent with the conspiracy charged, calling a DEA agent, who testified to purity levels of heroin sold in the New York area. Virella also introduced statements made by Vegas after Vegas's arrest, to the effect that John Carrero, not defendants Guzman and Virella, supplied the heroin used in the transaction.
 
 Government's rebuttal case
 
 16
 At the trial of Virella and Guzman, the Government on rebuttal introduced the fact of Vegas's conviction on the same charges (his trial preceded that of his co-defendants). To impeach Vegas's statements exculpating Virella and Guzman, the Government introduced portions of Vegas's trial testimony.
 
 Discussion
 A. Claims by Jose Vegas
 
 17
 Jose Vegas puts forth four claims on this appeal: ineffective assistance of counsel, wrongful admission of highly prejudicial evidence, an improper jury instruction, and wrongful admission of evidence obtained from an allegedly nonconsensual, warrantless search of his apartment that violated the Fourth Amendment.
 
 1. Ineffective assistance of counsel
 
 18
 Vegas argues that his trial counsel was ineffective. Success on this claim requires a two-step showing. First, the defendant must demonstrate that counsel's performance fell below the prevailing professional norms with a showing sufficient to overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). If such a showing is made, the defendant must also demonstrate a reasonable probability that absent counsel's unprofessional performance, the outcome of the proceeding would have been different. Id. at 687-88, 693-94, 104 S.Ct. at 2064-65, 2067-68. We find that Vegas failed to show that his counsel's assistance was ineffective.
 
 
 19
 As is often the case when convicted defendants complain after-the-fact of their lawyers' trial performance, we find that the choices made by the attorney were matters of trial strategy; because counsel's strategy was a reasonable one, these choices do not show incompetence. See United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987) ("decisions which fall squarely within the ambit of trial strategy ... if reasonably made, will not constitute a basis for an ineffective assistance claim"). Much of the objected-to performance is explained by counsel's strategic decision to pursue the defense that Vegas was entrapped by Carrero, rather than contest Vegas's involvement, a decision that appears sound in light of the tape-recorded evidence of Vegas's participation. The crux of Vegas's entrapment defense was that John Carrero, a friend of Vegas who, unbeknownst to Vegas, was also a DEA informer, pressured Vegas into posing as a drug dealer, so as to set up Vegas for arrest and prosecution.
 
 
 20
 Among Vegas's many complaints about his attorney's performance is his failure on cross-examination of Almonte, the government informer who was Vegas's buyer in the planned transaction, to impeach Almonte's credibility. The cross-examination of Almonte, however, was closely tailored to the entrapment defense. Under questioning by Vegas's counsel, Almonte admitted that John Carrero introduced him to Vegas and was present at their subsequent meetings. Vegas's counsel also drew out from Almonte the information that when Almonte posed as a drug dealer on behalf of the DEA, he talked like a drug dealer, exaggerated his role in proposed transactions, and tried to make himself "more important than" he was. These admissions allowed Vegas's counsel to attempt to explain away Vegas's taped statements about drug trafficking: "He, like Almonte, boasted on the tapes, exaggerated on the tapes. He made himself more important than he really was. Nelson Almonte told you that's what they do. You play a role. That's exactly what Mr. Vegas did. He was only doing the bidding for the government informant, John Carrero."
 
 
 21
 There was, furthermore, no good reason to impeach Almonte. Vegas was not denying what Almonte testified to--that Vegas arranged to sell heroin to Almonte. His contention was that he had been set up in this undertaking by Carrero, who was acting on behalf of the Government.
 
 
 22
 Vegas's contention that his attorney should have brought out what he now terms "exculpatory information"--a portion of a tape recording in which Vegas said something to the effect that Carrero was in the middle of the drug transaction--is unavailing for two reasons. First, the cross-examination of Almonte showed that Carrero was present during the planning of the drug transaction. Second, the central question of the case, from Vegas's perspective, was not whether Carrero was involved--the evidence proved he was--but rather, whether Vegas was a ready and willing participant or the victim of an entrapment scheme. In keeping with the entrapment defense, counsel argued to the jury that Carrero took advantage of his friendship with Vegas to induce Vegas to participate in this transaction, and that there was "no proof that the heroin came from anyone other than John Carrero."
 
 
 23
 In these and his numerous other complaints, Vegas has failed to show that his counsel did not perform up to professional norms. We therefore need not reach the question whether there is a reasonable probability that a different performance by counsel would have produced a different verdict. However, it seems unlikely that some other strategy could have overcome the tape-recorded evidence of Vegas's participation in the conspiracy to sell heroin.
 
 2. Admission of evidence
 
 24
 a. Allegedly prejudicial evidence
 
 
 25
 Vegas contends that certain evidence was wrongly admitted against him. He argues both that his counsel's failure to object to this evidence demonstrated ineffective assistance, and that the district court's decision to admit the evidence was reversible error. Because the evidence was properly admitted, we find no merit in either contention.
 
 
 26
 Vegas contends the following evidence was irrelevant to the case before the jury and was admitted only for the impermissible goal of showing he is a "bad person": (1) ammunition found in his apartment; (2) an offer to obtain cocaine for informant Almonte; (3) a thirteen-year-old narcotics conviction. As to the ammunition, this Court has repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly "keep firearms on their premises as tools of the trade." United States v. Wiener, 534 F.2d 15, 18 (2d Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976); see United States v. Fernandez, 829 F.2d 363, 367 (2d Cir.1987); United States v. Mourad, 729 F.2d 195, 201 (2d Cir.1984), cert. denied, 472 U.S. 1007, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985). This reasoning applies with extra force to the bullets in question because they were found in a bag together with a small digital scale that Vegas acknowledged was used to weigh heroin. See Wiener, 534 F.2d at 18 (emphasizing that gun, admitted as evidence of drug conspiracy, was in same bag as drug paraphernalia).
 
 
 27
 As to Vegas's offer to introduce Almonte to a supplier who had thirty kilograms of cocaine, this was properly admitted as evidence of Vegas's willingness to deal in drugs, rebutting his entrapment theory. The same is true of Vegas's 1980 conviction for participating in a cocaine conspiracy. Vegas attacks his trial counsel for failure to object to admission of the conviction. In fact it was Vegas's counsel, not the Government, who introduced it. This was not an act of incompetence on counsel's part but a strategic taking of the initiative. Recognizing that the conviction would be admissible on the Government's offer to show Vegas's willingness to deal in drugs, Vegas's counsel seized the opportunity to be first to mention it, so as to blunt its force. He argued in his opening statement that Vegas "had his one taste of jail, [and] was only looking forward to remaining with his family and son." There was nothing incompetent about this strategic decision. See Nersesian, 824 F.2d at 1321.
 
 
 28
 b. Evidence obtained in search
 
 
 29
 Vegas argues that the evidence found in the government's warrantless search of his apartment was seized in violation of the Fourth Amendment, and protests the pretrial determination by Judge Kram that his wife, Milagros Rojas, consented to the search. Whether consent was given is a factual question, and its resolution by the district court is not to be disturbed unless clearly erroneous. United States v. Puglisi, 790 F.2d 240, 244 (2d Cir.), cert. denied, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). We perceive no error in Judge Kram's finding that Milagros Rojas voluntarily consented to this search, and thus reject Vegas's claim that the search and seizure violated his constitutional rights.
 
 3. Jury charge on co-conspirators
 
 30
 Vegas's final claim concerns the district court's response to a note sent by the jury during its deliberations. The question asked by the jury was, "[I]n order for a conspiracy to exist, does it have to be with Vegas and specifically Guzman and/or Virella, or could it be with another individual known, such as the informer, Aponte, or unknown?" After first clarifying that the reference to "Aponte" was intended to be Almonte, and giving counsel an opportunity to advise on the proper response, the court instructed the jury:
 
 
 31
 First let me get the indictment, which I think I sent into you. It says together with William Guzman and Michael Virella and others known and unknown to the Grand Jury. So that a conspiracy can be with an unknown party. You cannot find a conspiracy with a government agent. A government agent is Almonte. If you find that Almonte was a conspirator, then [you have] to find that there is no conspiracy.
 
 
 32
 So that the first thing that you have to find is you don't specifically have to find Guzman and Virella. You could find that an unknown party was a member of the conspiracy. But you certainly can't find that Almonte was a member of the conspiracy. Otherwise that means that you find that no conspiracy existed. All right? You can proceed.
 
 
 33
 Vegas contends he was prejudiced by the judge's failure to mention John Carrero as a government agent, and thus one with whom the defendant could not conspire.
 
 
 34
 The argument is frivolous. The court clearly instructed the jury that a criminal conspiracy could not be formed with a government agent, and John Carrero had been repeatedly identified to the jury as a government agent of the same type as Almonte. Vegas's summation, heard shortly before the jury began deliberations, was centered on Carrero's role as an informant, trying to work off drug charges against him. The trial judge focussed on Almonte, rather than Carrero, for the simple reason that the jury's question asked explicitly about Almonte. Vegas offers no reason, and we find none, to believe that the jury was misled by the court's instruction into believing that it could find Vegas guilty of a conspiracy with Carrero.
 
 B. Claim by William Guzman
 
 35
 William Guzman raises one issue on appeal. He contends that the district court applied the wrong legal standard in deciding that, should Guzman testify, the government would be allowed to cross-examine him about a 1986 conviction for a 1977 sale of cocaine.[1]
 
 
 36
 Guzman claims that the judge made this ruling erroneously believing that the rules of evidence created a presumption in favor of admitting the prior conviction. The governing Rule 609, Fed.R.Evid.,[2] provides that such a conviction may be admitted to impeach the defendant's testimony if "the probative value of admitting [the conviction] outweighs its prejudicial effect to the accused...." The rule, in other words, requires a balancing and asserts no preference either in favor of, or against, receipt of the impeaching conviction. Guzman bases his claim on the fact that in making his ruling on Guzman's application to exclude the prior conviction from the government's cross-examination, the trial judge said:
 
 
 37
 I frankly spent a lot of time over the weekend on this and searching about backwards and forwards, and I even consulted with one of the most experienced judges in the court because it is difficult. But that judge's view is that the rule is the rule, and that there has to be a good reason to depart from it.
 
 
 38
 In other words, there is a presumption in favor of the rule, and under those circumstances, I feel that [the conviction] can be elicited on cross.
 
 
 39
 Guzman contends that when the trial judge spoke of "a presumption in favor of the rule," he meant, contrary to the true terms of the rule, that there is a presumption in favor of admitting the evidence.
 
 
 40
 Although we do not know precisely what the trial judge meant by his comment, we find no reason to assume that he meant something inconsistent with the governing rule. This is all the more true where the judge had just devoted much of the weekend to studying the rule in relation to the problem before him. And where the judge spoke explicitly of the presumption in favor of following the rule, it would be perverse to interpret his comment to mean something different. Perhaps the judge's meaning was that he was reluctant to admit a conviction for a criminal act committed 16 years earlier, but was required to do so if he followed the balancing test prescribed by the rule. Perhaps he meant that although this 1986 conviction was well within the 10-year period as to which the test of admissibility is simply whether probative value outweighs prejudicial effect, the criminal conduct on which it was based was more than 10 years old, raising the question whether, in spite of the rule, admissibility should be governed by the more demanding test for older convictions set forth in Rule 609(b) ("probative value ... substantially outweighs ... prejudicial effect"). Whether these or other concerns arose in the judge's mind, he cannot be faulted for following a "presumption in favor of the rule."C. Claims by Michael Virella
 
 
 41
 Michael Virella's claims include challenges to the sufficiency of evidence supporting his conviction and to certain evidentiary rulings.
 
 1. Sufficiency of evidence
 
 42
 Virella renews an argument, made to the district court in a post-trial motion, that the evidence was insufficient to convict him. We agree with the district court's rejection of this claim. The Government introduced sufficient circumstantial evidence that Virella was one of those referred to by Vegas as his "Pakistani" suppliers. As noted above, the evidence showed connections between Virella and Bangladesh (formerly East Pakistan). On February 3rd, Vegas alerted Almonte that "the Pakistanis" had arrived from overseas; on that same date, Virella travelled to New York from London under a false identity with his Bangladeshi roommate. On the day of the drug deal, Virella was observed first entering a parked car in front of the building, then going into the building, leaving his brother in the car. Almonte then received a call from Vegas saying the suppliers had arrived with the heroin. Once Almonte was in Vegas's apartment, Vegas told him that one of "the Pakistanis" was in another room on the same floor with Guzman and the heroin, while the other was outside in a car. When agents went to Vegas's apartment immediately after arresting Vegas downstairs, they found Virella and Guzman in the only other room on the same floor.
 
 
 43
 A few days previously, Vegas had told Almonte that his Pakistani source was then in France; Virella's address book showed many Parisian addresses. Vegas also said his supplier was a chemist; Virella's papers included chemical notations and he offered evidence furthermore that he was a student of chemistry.
 
 
 44
 Virella's principal complaints against the sufficiency of the evidence are (a) that the Government's own evidence showed he is a United States citizen, not a Pakistani, (b) some aspects of Vegas's description of his sources did not conform to evidence introduced about Virella, and (c) the Government's case relied on statements made by Vegas, who had proved himself the source of unreliable and contradictory information.
 
 
 45
 Given the substantial circumstantial evidence that Virella was involved in the crimes charged, we find that this attack falls far short of meeting the demanding standard for overturning the jury's determination of Virella's guilt. See United States v. Roldan-Zapata, 916 F.2d 795, 802 (2d Cir.1990), cert. denied, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991) (convictions are to be upheld if any rational trier of fact could have found essential elements of crime beyond reasonable doubt). We find that there was sufficient evidence to support Virella's conviction.
 
 2. Evidentiary rulings
 
 46
 Virella challenges the district court's rulings admitting evidence designed to show that Virella was one of the "Pakistanis" referred to by Vegas as his suppliers. The evidence in question showed that Virella had numerous connections with Bangladesh. The Government offered proof that Bangladesh was formerly known as East Pakistan, and that Bangladeshis are sometimes referred to as Pakistanis. We find no reason to upset the district court's judgment that this evidence was relevant and of greater probative value than prejudicial effect, of which we perceive none.
 
 
 47
 Nor do we see any merit in Virella's objection to the introduction of his address book. It contained addresses in Paris (and other international locations), as well as notations about chemistry. This was relevant by reason of Vegas's comments that his suppliers had been in France shortly before the heroin was delivered, and that one of his suppliers was a chemist. The introduction of the address book containing these circumstantially probative notations is clearly distinguishable from United States v. Afjehei, 869 F.2d 670, 674-75 (2d Cir.1989), where we held that evidence of a defendant's prior foreign travel was inadmissible as proof that he was a sophisticated traveler who would not have unwittingly carried a suitcase of drugs into the country.
 
 
 48
 Virella also challenges two rulings on the admissibility of out-of-court statements made by Vegas. His first argument concerns two post-arrest statements. The first statement, made during a proffer session, was that Carrero was the source of the heroin. The second statement, made during a pretrial conference before District Court Judge Kram, was, "I know who gave me the drugs and who didn't give me the drugs. They [referring to Virella and Guzman] didn't give me the drugs."
 
 
 49
 Virella asked the district judge to admit these as statements against penal interest under Federal Rule of Evidence 804(b)(3), which would make them admissible to prove the truth of the matter stated. The district court instead admitted the statements under Federal Rule of Evidence 806, as impeachment of Vegas, but not for the truth of the matter stated under Rule 804.
 
 
 50
 We see no error in the district court's ruling that the portions of Vegas's statements which tended to exonerate Virella were not admissible under Rule 804. Regardless whether other portions of Vegas's statements were against his penal interest, the part by which Vegas sought to exonerate Virella and Guzman was not; moreover, this statement bore no other indicia of reliability, as required by Rule 804(b)(3).
 
 
 51
 Virella also contends that the district court wrongly admitted testimony given by Vegas in his trial, in which Vegas contradicted himself concerning his knowledge of the quarter kilogram of heroin recovered from his apartment on the day of the arrest. At that point in the trial, Virella had already offered Vegas's post-arrest denials that Virella was his source. The Government used Vegas's self-contradictory and obviously unreliable trial testimony to impeach the denials on which Virella relied, by showing the jury that, following his arrest, Vegas's statements were calculatedly misleading.
 
 
 52
 Contrary to Virella's argument, this is perfectly consistent with Rule 806, which provides in pertinent part:
 
 
 53
 When a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked....
 
 
 54
 Vegas's hearsay statements exonerating Virella had been "admitted in evidence." Accordingly the Government was entitled under the rule to attack Vegas's credibility. It did so by the offer of his trial testimony. Nothing about Rule 806, or any other rule, bars the Government from supporting a declarant's credibility as to some of his statements and attacking it as to others.
 
 D. Other points
 
 55
 We have considered the other points advanced by the appellants and find they are without merit.
 
 E. Government's appeal of Guzman's sentence
 
 56
 The Government appeals the district court's decision not to impose a two point enhancement for obstruction of justice when it determined the sentence of William Guzman. The Government requested this enhancement under Sentencing Guideline Sec. 3C1.1. The Government argues that because Guzman's innocent explanation for his presence in Vegas's apartment at the time of the drug deal was clearly rejected by the jury verdict of guilty, the district court was obligated to make a finding as to whether Guzman had committed perjury, and if so, to enhance his sentence accordingly.
 
 
 57
 The Government reads United States v. Dunnigan, --- U.S. ----, ----, 113 S.Ct. 1111, 1119, 122 L.Ed.2d 445 (1993), and United States v. Shonubi, 998 F.2d 84, 87-88 (2d Cir.1993), to require that the district court make findings to justify its decision not to impose this enhancement. Those cases impose no such obligation. The central holding of Dunnigan is that enhancement of a sentence under Sec. 3C1.1 does not unconstitutionally burden a defendant's right to testify. --- U.S. at ---- - ----, 113 S.Ct. at 1117-18. Dunnigan does not say that every time a defendant is found guilty despite his exculpatory testimony, the court must hold a hearing to determine whether or not the defendant committed perjury. On the contrary, that opinion clearly states that when the court wishes to impose the enhancement over the defendant's objection, the court "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." --- U.S. at ----, 113 S.Ct. at 1117. Dunnigan does not suggest that the court make findings to support its decision against the enhancement.
 
 
 58
 Nor does Shonubi support the Government's position. There, we held that where the sentencing court had found that the defendant willfully lied in his testimony, the court was required to apply the obstruction of justice sentencing enhancement. 998 F.2d at 87-88. Here, the district court made no such finding. While on the one hand, the judge said, "I am certainly not finding it wasn't a perjury," he later stated that, despite "doubts," he "didn't find that the testimony was lacking on its face in accuracy or believability." The judge apparently concluded that the evidence of perjury was not sufficiently clear to determine whether perjury had or had not been committed. In these circumstances, Shonubi does not require the imposition of additional penalty for obstruction of justice.
 
 Conclusion
 
 59
 The judgments of conviction are affirmed, as is the sentence imposed on William Guzman.
 
 
 
 *
 The Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The 1977 arrest did not result in a conviction until 1986 because Guzman left the jurisdiction following the arrest
 
 
 [2]
 (a) General rule. For the purpose of attacking the credibility of a witness,
 (1) ... evidence that an accused has been convicted of ... a crime [punishable by death or imprisonment in excess of one year] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused....
 (b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect....
 Fed.R.Evid. 609.