**Elio ALBANESE, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Nos. 01 CR 1121, 03 CV 6326.**

United States District Court, S.D. New York.

Oct. 6, 2005.

Elio Albanese, Lewisburg, PA, pro se.

## ORDER DENYING MOTION TO CORRECT SENTENCE

McMAHON, District Judge.

Elio Albanese pled guilty before the Honorable Allen G. Schwartz to Count One of Indictment 01 CR 1121, charging him with conspiracy to commit robbery in violation of Title 18 Unites States Code, Section 1951. Judge Schwartz sentenced Albanese, principally, to a term of 70 months' imprisonment, a term of supervised release of 5 years, and to pay a special assessment of $100.

On August 21, 2003, Albanese filed a motion pursuant to 28 U.S.C. § 2255 for correction of his sentence on the ground that his court-appointed attorney rendered ineffective assistance of counsel. On October 23, 2003, petitioner sought leave to amend his petition to add a claim that the Government failed to meet its burden of proof as to the amount of loss attributable to him. The Court granted petitioner leave to amend and considered petitioner's request for relief on both grounds. On December 30, 2003, the Court dismissed Albanese's petition. On November 29, 2004, the Second Circuit remanded the petition to this Court for the limited purpose of considering Albanese's claim that his conviction and sentence should be vacated due to the fact that his attorney provided ineffective assistance in advising him to enter a plea agreement with the Government.

I asked the Government and the defendant to submit memoranda on the ineffective assistance of counsel issue, and both parties have complied. Albanese claims that his attorney was ineffective for two reasons: (i) because his attorney advised him to accept a plea agreement that contained a stipulated loss amount, for sentencing purposes, of $1.5 million to $2.5 million; and (ii) because his attorney did not file a timely notice of appeal regarding the District Judge's finding of the appropriate calculation of Albanese's Criminal History Category at his sentencing. The Government opposes the motion and asks that the Court deny the motion on the merits, without a hearing.

Elio Albanese was charged in Counts One and Two along with co-defendants Carmine Russo, Joseph Savarese, Nicholas

Fiorello and Anthony Campanelli with plotting, and taking substantial steps toward committing, an armed robbery of a credit union located within the New York Times Company's production plant in Queens, New York, in violation of Title 18 U.S.C. § 1951 (Hobbs Act Robbery). Each of the defendants pleaded guilty before the Honorable Allen G. Schwartz to Hobbs Act Robbery, except for Campanelli, who proceeded to trial before the Honorable Charles S. Haight, after the death of Judge Schwartz. Campanelli was convicted on the conspiracy count but was acquitted of the Hobbs Act robbery counts.

The evidence at Campanelli's trial showed that an undercover detective and a cooperating witness had more than a dozen lengthy meetings with Russo, Albanese, and Fiorello to plot the robbery. The tape recordings from these meetings memorialize *inter alia:* a group discussion over a floor-plan map of the target facility and its credit union which had been drawn by Campanelli; defendant's assessment of the company's security capabilities, including which guards were likely to be armed; discussions about the amount of money available on different days of the week; and assurances from Russo and Albanese that they would be ready to use firearms during the robbery. In addition, during the course of the conspiracy, the defendant's obtained New York Times uniforms, uniform patches and employee parking passes for use during the robbery from Campanelli. On or about February 7, 2001, Russo and Albanese, along with the undercover detective and cooperating witness, drove around the perimeter of the Times facility late at night, looking for weakness in security and for the best avenues of escape.

The robbery coconspirators were either members or associates of two "downtown" crews of the Genovese Crime Family of La Costra Nostra ("LCN"). The evidence showed that Savarese, who did not attend the group planning meetings, but met separately with the undercover detective to assess the progress of the plan and provide instruction, was a member of a crew headed by Genovese Capo, Rosario Gangi. Based on their recorded conversations discussing the robbery, the coconspirators expected to steal in excess of $2 million. Russo and Albanese were members of another crew of the Genovese Crime Family.

The evidence showed that the robbery was sanctioned by LCN higher-ups and was put on hold by Gangi, the Capo, after approximately 40 Genovese members and Associates were arrested in April 2001, on unrelated indictments returned in the Eastern District of New York. (PSR ¶¶ 20–28; see also trial transcript of *United States v. Campanelli*).

As stated above, Albanese pled guilty to conspiracy to commit Hobbs Act robbery. *See* transcript of Albanese's plea allocution. Albanese's plea was entered pursuant to a plea agreement with the Government dated May 15, 2002 (the "Plea Agreement").

The Plea Agreement (at page 2) contained a stipulation that the adjusted offense level for Albanese's conviction was 21. The calculations upon which this offense level was based were included in the Plea Agreement. Specifically, pursuant to U.S.S.G. § 2B3.1(a), the base offense level was 20. The parties agreed that a two-level increase in the offense level was warranted because the taking of property from a financial institution was an object of the offense, pursuant to U.S.S.G. § 2B3.1(b)(1), and a further five-level increase in the offense level was warranted because the intended loss was more than $1.5 million and less than $2.5 million, pursuant to U.S.S.G. § 2B3.1(b)(7)(F) and (G). The parties also agreed that a three-

level decrease in the offense level was warranted, because the defendant did not complete all of the acts the conspirators believed necessary for the successful completion of the substantive offense, pursuant to U.S.S.G. § 2X1.1(b)(2), and a further three-level reduction in the offense level was warranted for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).

The plea agreement (at pages 3–4) also contained a stipulation concerning the defendant's Criminal History, which the parties calculated as Criminal History Category V, based on 12 Criminal History Points. In the plea agreement, the parties stipulated that the "stipulated Sentencing Guidelines range" for the defendant was 70 to 87 months' imprisonment. The plea agreement further provided, in pertinent part, that the "defendant reserves the right to seek a downward departure in his Criminal History Category from V to IV, pursuant to U.S.S.G. § 4A1.3, on the ground that his Criminal History Category significantly over-represents the seriousness of his criminal history." The Government expressly reserved the right to oppose such a motion.

Albanese was represented by counsel at the plea hearing, and Judge Schwartz conducted a thorough allocution that complied with Rule 11 of the Federal Rules of Criminal Procedure. In particular, Judge Schwartz elicited from Albanese that the defendant had discussed with his attorney how the Sentencing Guidelines might be applied to his case, and informed Albanese that Judge Schwartz was not bound by any sentencing estimates that Albanese and his attorney might have discussed. (G. Memo. 12/12/03, Ex. B at 14). Judge Schwartz informed Albanese that his case was governed by the Sentencing Guidelines and explained to him that the District Court could depart up or down from the Guidelines range under certain circumstances. *Id.*

Judge Schwartz then reviewed the Plea Agreement with Albanese. Judge Schwartz had Albanese confirm that he read the agreement before he signed it, that he had gone over it with his attorney, Ellyn Bank, Esq., and that Ms. Bank explained "each and every" provision of the agreement. (*Id.* at 15–16). Judge Schwartz then had Ms. Bank confirm the fact that Albanese had signed it, that she had in fact explained to Albanese what the agreement said and what it meant, and that she was fully satisfied that Albanese understood what the agreement said and what it meant. (*Id.* at 16–17).

Judge Schwartz then drew Albanese's attention to the fact that, even though the agreement contained a stipulated sentencing guidelines range of 70 to 87 months' imprisonment, the Court was not bound by the agreement, and advised Albanese that he would still be bound by his plea of guilty, even if his sentence was greater than 87 months. *Id.*

Subsequent to Albanese's plea and prior to sentencing, the Probation Department prepared and issued a Presentence Investigation Report ("PSR"), in which Probation calculated that Albanese's adjusted offense level was 21, that his Criminal History Category was V and that his resulting Sentencing Guidelines Range was 70 to 87 months' imprisonment—all as stipulated by the parties in the plea agreement.

At the sentencing proceeding, which was conducted on September 6th and September 19, 2002 (*Id.*, Exhibits C and D), Albanese was again represented by Ellyn Bank. Before imposing sentence, the Court confirmed with Albanese that he had reviewed the PSR, that he had gone over its contents with his lawyer, and that he had no objections to anything contained in the

PSR. (*Id.*; Ex. C at 3). At sentencing, the defendant did not challenge the existence of the prior convictions or the facts underlying the convictions as indicated in the PSR. Furthermore, he did not challenge the application of the Guidelines to these convictions. Nonetheless, Albanese, through his attorney, argued that the result of the application of the guidelines was unwarranted, and asked for a reduction in the criminal history calculation. (*Id.* at 18–21). The Government opposed the defendant's motion. Judge Schwartz denied Albanese's downward departure motion. Judge Schwartz then sentenced Albanese to a serve a term of 70 months' imprisonment, followed by a term of supervised release of 5 years, and to pay a special assessment of $100.

After imposing sentence, the Court advised Albanese that he had the right to appeal if he had not already waived his right in the Plea Agreement. (G. Memo. 2/12/03, Ex. D at 15). The plea agreement in fact contained a waiver of Albanese's right to appeal his sentence (though not his conviction) if he was sentences within or below the stipulated range—which he was. Judge Schwartz also advised Albanese that if Ms. Bank was unavailable to represent him, the Court would appoint another attorney for him free of charge. (*Id.* at 15). Albanese did not appeal his conviction or sentence.

The Government has filed an affirmation from Ellyn Bank. (G.Memo. 12/12/03, Ex. E). Ms. Bank affirmed that, in her representation of Albanese, she thoroughly reviewed all of the discovery in the case and fully discussed it with Albanese. She also stated that she had many discussions in which she reviewed calculations with Albanese, and ultimately Albanese decided to accept the Government's plea offer with a stipulated Sentencing Guidelines Range of 70–87 months' imprisonment. Ms. Bank also stated that, after Albanese received the 70 months sentence—which was the lowest possible sentence pursuant to the Sentencing Guidelines Range stipulation— she advised Albanese that he had waived his right to appeal the sentence in the plea agreement. Ms. Bank affirmed that at no time during the ten days following the entry of judgment did Albanese request that she file a Notice of Appeal on his behalf.

Ms. Bank stated that many months after Albanese was sentenced, she received a call from him, in which he stated that he wanted to review with her the calculations in his plea agreement. Ms. Bank reminded Albanese that they had carefully reviewed all the relevant calculations and determined the appropriate guidelines range, and that he understood that before he signed the plea agreement and entered his plea. Ms. Bank again stated that, even during this conversation, Albanese never asked her to file a Notice of Appeal on his behalf. *Id.*

*Ineffective Assistance of Counsel Claim*

■ To prevail on a claim of ineffective assistance of counsel, a petitioner must: (1) overcome a strong presumption that his counsel's conduct was reasonable and show that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms;" and (2) "affirmatively prove prejudice," that is, show that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 693–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *accord, e.g., Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (extending *Strickland* standards to ineffective assistance challenge to guilty pleas); *United States v. Hansel*, 70 F.3d 6, 8 (2d Cir.1995) (per curiam); *United States v. Vegas*, 27 F.3d 773, 777 (2d Cir.1994);

*United States v. Tarricone*, 21 F.3d 474, 475 (2d Cir.1993); *United States v. Eisen*, 974 F.2d 246, 265–66 (2d Cir.1992). Only if both of these elements are satisfied can it be concluded that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

In analyzing a claim that counsel's performance fell short of Constitutional standards, a reviewing court " 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.' " *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir.1990) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Thus, under *Strickland*,

> [an attorney's] strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation.

*Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. The Second Circuit has emphasized that, "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)). *See also Strouse v. Leonardo*, 928 F.2d 548, 553 (2d Cir.1991); *United States v. Jones*, 918 F.2d 9, 11–12 (2d

Cir.1990). Thus, a defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate. *See, e.g., United States v. Vegas*, 27 F.3d at 777; *Mason v. Scully*, 16 F.3d 38, 42 (2d Cir. 1994); *United States v. Eisen*, 974 F.2d at 265; *United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir.1986).

For these reasons, the assessment of counsel's performance under the first prong of the *Strickland* test should focus on the "fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. The emphasis should not be on grading counsel's performance, but on "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*

Finally, even if the reviewing court determines that an attorney's performance was objectively unreasonable and unprofessional, the prejudice component of *Strickland* must still be satisfied in order to warrant reversal of the defendant's conviction on ineffective assistance grounds. This second prong of *Strickland* requires the court to decide whether "the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. at 369, 113 S.Ct. 838. "The prejudice component of the *Strickland* test … focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* at 372, 113 S.Ct. 838.

■ Where a defendant challenges a guilty plea on the basis of alleged ineffectiveness of counsel, he must show that, but for counsel's error, there is a reasonable probability that he would not have pleaded guilty. *Hill v. Lockhart*, 474 U.S. at 59,

106 S.Ct. 366; *Tate v. Wood*, 963 F.2d 20, 23–24 (2d Cir.1992); *Panuccio v. Kelly*, 927 F.2d 106, 108 (2d Cir.1991); *Mitchell v. Scully*, 746 F.2d 951, 957 (2d Cir.1984). The Second Circuit has repeatedly rejected ineffective assistance claims where, as here, the petitioner in retrospect finds fault with the plea negotiated by counsel. *See, e.g., Panuccio v. Kelly*, 927 F.2d at 109 (rejecting claim of ineffective assistance based on counsel's failure to inform defendant of possible defense because defense would not likely have succeeded at trial and because plea substantially reduced defendant's sentencing exposure); *Hayle v. United States*, 815 F.2d 879, 882 (2d Cir.1987) (rejecting defendant's claim that counsel was ineffective because counsel failed to inform him that one count of indictment did not charge a federal offense; plea permitted defendant to have 62 counts of indictment dismissed); *Mitchell v. Scully*, 746 F.2d at 957 (2d Cir.1984) (rejecting defendant's claim that counsel was ineffective because he did not inform the defendant, prior to his pleading guilty, of an affirmative defense; counsel had every reason to think that raising defense had almost no chance of success, would expose the defendant to risk of additional punishment on other charges, with little to be gained if defense succeeded).

■ An attorney's failure to communicate a plea offer to his client, or to advise his client adequately about the plea offer, may constitute constitutionally deficient performance. *See, e.g., Cullen v. United States*, 194 F.3d at 404; *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir.1998); *Boria v. Keane*, 99 F.3d 492, 496–97 (2d Cir.1996). However, to establish a Sixth Amendment violation, the defendant must establish that his attorney in fact failed to communicate a plea offer or failed to provide adequate advice about the plea offer and his sentencing exposure. *United*

*States v. Gordon*, 156 F.3d at 380; *Boria v. Keane*, 99 F.3d at 496–98.

Even if the defendant can prove that his attorney failed to communicate a plea offer (not the case here) or failed to provide adequate advice about a plea offer, the defendant must still prove prejudice. That is, he must prove "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. at 59, 106 S.Ct. 366; *see also United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir.2001) (per curiam); *Gordon*, 156 F.3d at 380 (armed career criminal who faced 262–327 month sentence after trial established that he would have accepted 84–month plea offer but for defense counsel's incorrect advice that maximum sentence after trial was ten years). This burden is particularly difficult to meet where a defendant was aware of the "actual sentencing possibilities" and nevertheless decided to plead guilty. *Ventura v. Meachum*, 957 F.2d 1048, 1058 (2d Cir.1992) (court's conveyance at plea allocution of the actual sentencing possibilities that result from a defendant's guilty plea may correct any misrepresentation by counsel as to defendant's probable sentence); *Hunter v. Fogg*, 616 F.2d 55, 58 (2d Cir.1980).

■ In the present matter, Albanese claims his counsel committed Constitutional error by failing to challenge the determination of the relevant loss amount and the corresponding application of the 5–level enhancement for loss amount imposed pursuant to U.S.S.G. § 2B3.1(b)(7)(F) and (G), to which he expressly stipulated in the Plea Agreement. Notably, he does not argue that his plea was anything other than knowing and voluntary. Neither does he claim that he would have gone to trial but for the purported error made by his counsel in calcu-

lating the loss amount to be applied to him at sentencing. He simply says that the lawyer should have challenged the accuracy of the stipulated loss amount. This fails to make out a claim for ineffective assistance of counsel, for two reasons.

To satisfy his burden to show that counsel provided ineffective assistance of counsel to such a degree that Albanese was denied his Constitutional right to effective counsel, he must make a showing "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. at 59, 106 S.Ct. 366. Albanese does not even make that assertion in his papers, let alone attempt to prove it.

Additionally, Albanese's ineffective assistance claims based on his counsel's alleged failure to object to the loss amount attributed to his robbery conspiracy conviction should be rejected because the sentence was imposed in accordance with the stipulation to which Albanese agreed. Given Albanese's sworn statements during the allocution that he had gone over the Plea Agreement with his lawyer and understood every aspect of it—including the loss amount calculation and the corresponding five level enhancement—it is clear that Albanese knowingly and voluntarily agreed to abide by its terms. This is not a case in which a defendant alleges that his lawyer failed to convey the actual terms of the stipulation to him. Rather, Albanese has decided that there was an error in calculating the stipulated loss amount. But it is too late for Albanese to reach this conclusion. If Albanese had a quarrel with the loss amount in the Plea Agreement, he had to option of convincing the Government that a lower amount was appropriate. And if that strategy failed, he could have declined to enter into the agreement.

In any event, the stipulation did not control his sentence. Judge Schwartz's independent calculation of the loss amount dictated the Guidelines sentence that was imposed. His attorney could not contest the stipulated amount because, *with her client's permission,* she had stipulated to it! Had she stipulated to an erroneous amount, the error could have been corrected by Probation and/or the Court. Judge Schwartz advised Albanese during the plea allocution that nothing in the plea agreement (including the stipulation) was binding on the Court, and that Probation and the Court would ultimately do their own loss calculation. Which they did. But after making their own independent calculation, Probation and Judge Schwartz reached the same conclusion that the Government and Ms. Bank had reached in their plea negotiations. Thus, Albanese has not shown that he was prejudiced in any way by his lawyer's failure to go back on her (and his) stipulation and contest the loss amount.

Furthermore, the loss amount that Albanese agreed to was amply supported by the Government's evidence, including the recorded statements of Albanese and his co-conspirators, who were taped discussing the amount of money he and his co-conspirators intended to find during the course of the robbery. For example, the undercover detective, Detective Smith, was asked about his conversation with Nick Fiorello concerning the intended theft, "Did Mr. Fiorello indicate how much money he believed was available during the big score?" Detective Smith replied, "Between 2 and 6 million." (Tr. at 86; GX 20–T at 6). Detective Smith was also asked about another conversation later in the conspiracy concerning the source of the information of the "two [million dollars]" that the conspirators intended to steal, "Detective Smith, when Nick Fiorello says,

he said it's close to two ... what is your understanding of who Nick Fiorello was referring to?" Detective Smith replied, "Anthony, the inside guy he has at the New York Times." (Tr. at 194, *see also*, GX 23–T at 12; GX 24–T at 3, 5; GX 29–T at 8; GX 33–T at 8). At one point during a recorded conversation where the Times robbery plot was being planned Albanese himself is heard saying, "I believe it is a wonderful thing. I bet there is over a million in there," referring to the Times plant. The discussion went on to describe how Albanese believed that each of the workers in the plant makes over a $1,000 a week. (See Capanelli Tr. at 276–277, GX 29–T at 8). At an earlier meeting Albanese, Russo, Fiorello, Detective Smith and the CW, while sitting at Katz's delicatessen, had a detailed discussion during which they discussed the fact that they believe there could be as much as $2.5 million in the plant. (GX 24–T at 3–4). During the discussion of the $2.5 million, Albanese asked when The Times personnel would bring the money into the plant. When told that money was brought on Monday, Albanese stated, "That means we gotta get there Monday night." (*Id.*).

This evidence was sufficient to convict Albanese's co-conspirator, Anthony Capanelli, of the armed robbery conspiracy in a trial before Judge Haight. Clearly, counsel did not commit an error of constitutional proportion by failing to object to a stipulated loss amount that was undergirded by the evidence—and that was, if anything, on the low side.

The Plea Agreement was negotiated between the parties, and its Guideline calculation reflects the significant concessions which were made by the Government.

For example, as a result of extensive negotiations with Albanese's counsel, as well as counsel for co-defendant Carmine Russo, the Government—notwithstanding that the defendant conspired to commit an armed robbery—did not press for a 5–level enhancement for the use of guns, an enhancement that was sought by the Government against co-defendant Anthony Capanelli and applied by Judge Haight to Capanelli's sentence.[1] The Government also declined to seek any enhancement or adjustment based on the fact that the offense contemplated the restraint of the security guards who were stationed outside of the New York Times Credit Union.

Albanese's reliance on Judge Haight's finding regarding the loss amount calculation for Capanelli, as evidence that Ms. Bank provided ineffective assistance to petitioner, is misplaced. The gravamen of Judge Haight's ruling was that the Government failed to prove to his satisfaction that the money Capanelli intended to steal was actually available at the credit union to be stolen. Thus, Judge Haight concluded that he could not determine an intended loss amount. Notwithstanding the evidence introduced showing the amount the conspirators intended to steal, Judge Haight concluded that he could not award any enhancement for loss amount because the Government failed to offer evidence about the amount of money actually present at the Credit Union at the time of the proposed robbery. Judge Haight reasoned, "If conspirators were sufficiently wicked to agree to rob a child selling lemonade at the end of her parent's driveway for 5 cents a glass, the conspirators might declare their unanimously held specific intent to steal an amount in excess of $1.5

---

1. Judge Haight applied the enhancement at the initial sentencing. The Second Circuit remanded for reconsideration of that single issue. Judge Haight stuck to his guns (figuratively as well as literally) and persisted in applying the enhancement. His ruling was not overturned on appeal.

million, thereby (the Government might argue) triggering the five level adjustment the government wishes to impose on Capanelli, but the trial record would not allow it." Because the New York Times did not want the Government to proffer how much money was held at the credit union, the Government argued to Judge Haight that he should draw inferences from the facts in the record concerning the credit union. Judge Haight declined to do so.

Judge Haight was certainly persuaded to reach that conclusion with respect to defendant Capanelli because Capanelli himself was not recorded on any conversations discussing the amount of money he intended to be available to the robbers, or in any other recorded conversation. In contrast to that, as detailed above, Albanese is recorded on numerous conversations discussing the fact that he believed there to be millions of dollars present at the facility, and that the were times to carry out the robbery to maximize the robbers' chances of coming away with the most lucrative heist.

Albanese and his three coconspirators who pleaded guilty are in a very different posture than Capanelli who, after trial, contested each and every one of the adjustments sought by Government and recommended by the Probation Office. In their pleas of guilty, Albanese, Russo, Savarese, and Fiorello, each admitted that they intended to commit an armed robbery of an active Federal Credit Union. Albanese's plea agreement contained a stipulation concerning the intended loss amount from this robbery that was the product of a negotiated agreement that conferred considerable benefits on Albanese and fairly reflected the amount of money Albanese and his coconspirators intended to steal. Albanese was specifically directed by Judge Schwartz to the guideline stipulation during his guilty plea, when Judge

Schwartz asked Alabanese, "At Page 2 of the [plea] agreement there is, under paragraph A, a statement of what you and the government have stipulated is your applicable guidelines offense level, and it begins by stating that your base offense level is 20. And then there are certain increases and decreases which result in the final paragraph, in an agreement, that the applicable guidelines offense level is 21, do you see that?" Albanese replied, "Yes I do your honor." The intended loss amount stipulation contained on page 2 of the plea agreement was acknowledged by Albanese during his plea of guilty and it was the same loss amount that was determined by the Probation Office for Russo, Fiorello, Savarese, and Capanelli and independently found by Judge Schwartz for Albanese, Russo, Savarese, and Fiorello at the time each man was sentenced. As the Second Circuit has held, a "criminal defendant's self-inculpatory statements made under oath at his plea allocution carry a strong presumption of verity and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." *Adames v. United States*, 171 F.3d 728, 732 (2d Cir.1999) (internal citations and quotations omitted). Counsel's failure to object to the stipulated loss amount, therefore, did not prejudice petitioner, and without a showing of prejudice, Albanese cannot maintain a claim of ineffective assistance. *See generally Strickland*, 466 U.S. at 686–88, 104 S.Ct. 2052 (setting forth standard for establishing ineffective assistance of counsel claim). Indeed, in light of Albanese's stipulations in the plea agreement, his answers to Judge Schwartz at the plea allocution, his failure to object to the loss amount calculation at his sentencing, and the overwhelming evidence supporting the loss amount detailed above, defense counsel had no good faith basis to object.

To the extent that Albanese attempts to claim his attorney was ineffective for failing to raise issues regarding the constitutionality of the application of the Sentencing Guidelines to his case, as addressed by the Supreme Court in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Second Circuit has held that the *Booker* decision does not apply retroactively to cases—such as Albanese's—on collateral review. *See Guzman v. United States*, 404 F.3d 139 (2d Cir.2005)("*Booker* does not apply retroactively to cases on collateral review"). Accordingly, *Booker* does not apply to Albanese's case.

*Albanese's Claim that Counsel Failed To File An Appeal*

■ Albanese contends that Ms. Bank was ineffective for failing to file a notice of appeal despite Albanese's purported instructions that she do so. However, Albanese contention is belied by Ms. Bank's affirmation.

The Second Circuit has held that, under *Strickland*, "[a] lawyer who disregards a defendant's specific instructions to file an appeal acts in a manner that is professionally unreasonable." *Garcia v. United States*, 278 F.3d 134, 137 (2d Cir.2002); *see also Hernandez v. United States*, 202 F.3d 486, 489 (2d Cir.2000) (holding that a defendant is deprived of "reasonably competent representation" when he "fails without excuse to file a timely notice of appeal"). Moreover, prejudice is presumed under such circumstances, even without a showing of the merits of the petitioner's appeal. *Id.; Garcia*, 278 F.3d at 137.

As set forth in Ms. Bank's affirmation, Albanese did *not* instruct Ms. Bank to file an appeal. As Ms. Bank recognizes, the terms and conditions of the Plea Agreement foreclosed Mr. Albanese's right to appeal a sentence within the 70 to 87 month sentencing range stipulated in the Plea Agreement. Indeed, Ms. Bank discussed this fact again with Albanese after he was sentenced. Most tellingly, Albanese "many months after" his sentencing, contacted Ms. Bank and again reviewed with her the terms of the plea agreement he knowingly and voluntarily entered, and even then did not direct Ms. Bank to file (an untimely) notice of appeal.

Albanese's claim of ineffective assistance of counsel appears to be based on nothing more than his after-the-fact displeasure with the Government's plea offer and the resulting sentence. Albanese's current dissatisfaction does not constitute a valid basis on which to find that his counsel was ineffective. *See United States v. Garguilo*, 324 F.2d 795, 797 (2d Cir.1963) ("A convicted defendant is a dissatisfied client, and the very fact of his conviction will seem to him proof positive of his counsel's incompetence.").

The petition is denied in its entirety.