101 F.3d 688
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
UNITED STATES OF AMERICA, Appellee,
v.
JACK ROBINSON; ANNA ROBINSON; and ANDRE POLLAK,
Defendants-Appellants. Nos. 95-1688, 95-1692, 95-1695.
 United States Court of Appeals, Second Circuit.
 June 28, 1996.
 
 APPEARING FOR APPELLANT JACK ROBINSON: Diarmuid White, New York, NY.
 APPEARING FOR APPELLANT POLLAK: Kenneth J. Kaplan, Kaplan & Katzberg, New York, NY.
 APPEARING FOR APPELLEE: Emily Berger, Assistant United States Attorney for the Eastern District of New York, Brooklyn, NY.
 E.D.N.Y.
 AFFIRMED.
 Before MINER, JACOBS and PARKER, Circuit Judges.
 
 
 1
 UPON CONSIDERATION of these appeals from judgments of the United States District Court for the Eastern District of New York, it is hereby
 
 
 2
 ORDERED, ADJUDGED, AND DECREED that the judgments be and hereby are AFFIRMED.
 
 
 3
 This cause came on to be heard on the transcript of record and was argued by counsel.
 
 
 4
 Defendants-appellants Jack Robinson, Anna Robinson, and Andre Pollak (together, the "defendants") appeal from judgments entered in the United States District Court for the Eastern District of New York (Amon, J.), convicting the defendants, following a jury trial, of conspiracy to traffic in counterfeit goods, in violation of 18 U.S.C. § 371, and mail fraud, in violation of 18 U.S.C. § 1343, and convicting Jack and Anna Robinson of trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320. Jack Robinson was sentenced principally to a 41-month term of imprisonment; Anna Robinson was sentenced principally to a one-year-and-one-day term of imprisonment; and Pollak was sentenced principally to an 18-month term of imprisonment.
 
 
 5
 In May or June of 1988, Randall Ingram, an executive at Innovative Sampling Technology, a commercial printing company, began discussions with Pollak regarding a scheme to counterfeit Estee Lauder's Clinique Dramatically Different Moisturizing Lotion ("DDML"). Pollak informed Ingram that he obtained the idea "from his Big Buddy or his connection, a real powerful man in the cosmetic and fragrance industry." Ingram later learned that Pollak's "Big Buddy" was Jack Robinson. In late July of 1988, Robinson called Ingram to discuss the counterfeiting scheme. Robinson told Ingram "to deal specifically with his contact, Andre Pollak." Because of his experience in the printing industry and his connections with cosmetic producers, Ingram was placed in charge of obtaining component parts and assembling the counterfeit DDML packages. Ingram handled the expenses through the Sammi Group, an inactive corporation that he had formed.
 
 
 6
 In December of 1988, actual production of the counterfeit DDML began. The DDML was packaged at Victory Storage, a self-storage facility in Staten Island. The operation utilized a system of conveyor belts and a filling machine that filled the bottles with the counterfeit DDML. According to Ingram, Jack Robinson oversaw the entire operation.
 
 
 7
 In January of 1989, Ingram and Jack Robinson discussed producing another cosmetic item in order to diversify their product line and to reduce suspicions that might arise from their manufacturing of large amounts of counterfeit DDML. They chose Revlon's Eterna 27 cream. As he had for the production of the counterfeit DDML, Ingram obtained the component parts for manufacturing the Eterna 27 cream. The money for the expenses that Ingram incurred in obtaining the component parts usually came from Jack Robinson or Pollak.
 
 
 8
 In August of 1989, Postal Inspector William Kezer began his investigation of counterfeit cosmetic products that were being sold in England and the United States. His investigation led him to Ingram. On August 28, 1989, Ingram and Robinson, apparently out of concern that they would be discovered, made arrangements to move their counterfeiting operation from the Victory Storage facility to Stop & Storage, another Staten Island storage facility.
 
 
 9
 On August 30, 1989, Kezer and a team of five or six postal inspectors executed a search warrant for the storage units at Stop & Storage. The Kezer team seized 46,000 completed bottles of DDML, 192,000 empty bottles of DDML, large quantities of Clinique boxes, Clinique box liners, Clinique screw tops, Eterna cardboard sleeves, Eterna boxes, Eterna packing tapes, and Eterna containers.
 
 
 10
 On September 8, 1989, Ingram began cooperating with the postal inspectors. Thereafter, on August 19, 1994, the defendants were indicted for their involvement in the counterfeiting scheme. At trial, the government attempted to show that the defendants manufactured and sold two counterfeit cosmetic items. According to the government, Jack Robinson financed and oversaw the operation, and he and Pollak recruited Ingram because of his expertise in cosmetics production and promotion. Anna Robinson apparently was used to insure that the counterfeit products were comparable to the genuine cosmetics.
 
 
 11
 On the third day of trial, the government announced that it would call Anton Fleming, the manager of Victory Storage, as a witness. Fleming testified that, in 1989, the Robinsons rented several storage sheds at Victory Storage, and that, while he did not know what Jack Robinson kept in his sheds, he was aware that Anna Robinson kept perfumes in her sheds. As to Ingram, Fleming stated that Ingram had rented sheds at Victory Storage for the Sammi Group. However, Fleming claimed that he did not know that the Sammi sheds were being used to produce cosmetics and that he never saw his sons in the Sammi sheds filling bottles. Finally, Fleming testified that he knew that the Sammi Group moved out of their sheds in August of 1989. However, Fleming claimed that he did not help with the move, nor did he know whether his sons assisted with the move.
 
 
 12
 Later that day, the government called Kezer to the stand in order to question him about statements that Fleming had made during interviews in 1989 and 1991. The government sought to use Kezer's testimony to impeach Fleming. The defendants objected, claiming that the government should not be allowed to introduce prior inconsistent statements made by Fleming for impeachment purposes, because the government had known that Fleming's testimony would be detrimental to its case before it called him as a witness. The district court disagreed, and permitted the government to elicit testimony from Kezer regarding his interviews with Fleming in 1989 and 1991 for impeachment purposes.
 
 
 13
 On appeal, the Robinsons argue that the district court erred in permitting the government to impeach Fleming through the testimony of Kezer. According to the Robinsons, the only reason that the government called Fleming as a witness was to impeach him with his prior inconsistent statements. While we agree that the government may not call a witness to testify for the sole purpose of impeaching that witness with his prior inconsistent statements, see United States v. Morlang, 531 F.2d 183, 189 (4th Cir.1975), we think that the Robinsons fail to demonstrate that the government acted in bad faith in calling Fleming to testify.
 
 
 14
 We have held that, "[w]here the Government has called a witness whose corroborating testimony is instrumental to constructing the Government's case, the Government has the right to question the witness, and to attempt to impeach him, about those aspects of his testimony that conflict with the Government's account of the same events." United States v. Eisen, 974 F.2d 246, 262-63 (2d Cir.1992), cert. denied, 507 U.S. 998 (1993). In the present case, the government claims that it had expected that Fleming's testimony would be instrumental to its case because it believed that Fleming would testify about the transfer of the counterfeiting operation to the Stop & Storage facility. The government also claims that it had expected Fleming to testify that Jack Robinson stored cosmetics in sheds that he rented at Victory Storage. In light of the district court's finding that "the government rightly called [Fleming] to ask matters important to their case," and because the Robinsons are unable to demonstrate that the government had an alternative purpose in calling Fleming, we think that the district court properly allowed the government to impeach Fleming after he failed to give the instrumental testimony that the government had sought.
 
 
 15
 Prior to trial, the government stated that it would seek to introduce evidence of the defendants' involvement in other counterfeiting ventures. The government proffered that this evidence would demonstrate knowledge and intent on the part of the defendants. In order to preclude the government from introducing the similar acts evidence, Pollak stipulated that he would not raise the knowledge and intent issue in his defense. The district court subsequently charged the jury that, as to Pollak, it could find that the government had proven the elements of knowledge and intent beyond a reasonable doubt because Pollak had stipulated that knowledge and intent are not at issue.
 
 
 16
 Pollak now argues that the district court's instruction to the jury regarding his stipulation "was defective because it charged elements of the offense, and then removed them, needlessly confusing the jury." We disagree.
 
 
 17
 In United States v. Figueroa, 618 F.2d 934 (2d Cir.1980), we held that:
 
 
 18
 When the Government offers prior act evidence to prove an issue, counsel must express a decision not to dispute that issue with sufficient clarity that the trial court will be justified (a) in sustaining objection to any subsequent cross-examination or jury argument that seeks to raise the issue and (b) in charging the jury that if they find all the other elements established beyond a reasonable doubt, they can resolve the issue against the defendant because it is not disputed.
 
 
 19
 Id. at 942 (emphasis added). In the present case, because the district court's charge adheres to our holding in Figueroa, we think that Pollak's argument is without merit.
 
 
 20
 We have considered the defendants' remaining contentions, and we find them all to be without merit.